[No. D006616. Fourth Dist., Div. One. Nov. 3, 1988.]

MIRA DEVELOPMENT CORPORATION OF SAN DIEGO et al.,
Plaintiffs and Appellants, v.
CITY OF SAN DIEGO et al., Defendants and Respondents.

1202

COUNSEL

Asaro & Keagy, Steven A. McKinley and Arnold Neves, Jr., for Plaintiffs and Appellants.

John W. Witt, City Attorney, Ronald L. Johnson, Assistant City Attorney, C. Alan Sumption, Chief Deputy City Attorney, and Larry E. Renner, Deputy City Attorney, for Defendants and Respondents.

OPINION

**WORK, Acting P. J.**—Mira Development Corporation (Mira) unsucessfully brought a writ of mandate petition to superior court challenging the San Diego City Council's denial of its application to rezone property in the Otay Mesa/Nestor planning area from single family to multifamily (low-medium) density in order to allow development of an apartment project. Mira argues the denial of the rezone application was an abuse of discretion since (1) the city was committed to approve Mira's proposal for low-medium density housing, based on the property's low-medium density designation in the community plan and the stated objective in the general plan's housing element to increase the supply of rental housing in the area; (2) the city council denied the application solely because it wanted to freeze the price of the property for its later acquisition for a park site, and (3) the city council failed to make written findings as required under Government Code[1] section 65589.5 for disapproval of a proposed housing development which complies with the applicable general plan, zoning and development policies.

We hold the city council did not abuse its discretion in denying the rezone application on the basis that the proposed multifamily development would outstrip the provision of needed public services and improvements in

---

[1] All subsequent statutory references are to the Government Code unless otherwise specified.

the area, a concern included within the community and general plans. We hold written findings were not required under section 65589.5; but even arguendo if they were, the error would be harmless since there is substantial evidence in support of the city council's decision, and the basis of the city council's decision is apparent from the transcript of the council meetings.

## FACTUAL AND PROCEDURAL BACKGROUND

According to Mira's writ of mandate petition, it purchased 11.1 acres in the Otay Mesa/Nestor planning area of San Diego, conditioned upon Mira obtaining a rezoning of the property from the existing R1-10000 to R-3000. The R1-10000 zone allows for one single-family dwelling unit per 10,000 square feet (4 dwelling units per acre), whereas the R-3000 zone allows for multifamily dwelling units, up to 15 units per acre. (San Diego Mun. Code [hereafter Mun. Code], §§ 101.0407, 101.0409, 101.0410.) Mira alleged it was informed by one of the owners that the city's parks and recreation department had expressed an interest in purchasing his property for a park. Mira alleged the city's parks and recreation and real property departments advised it in August 1986 that the city was interested, but lacked available funds for the acquisition and therefore it would not stand in the way of Mira's development. Mira commenced processing its development proposal with the city.

### The City's Initial Study

The city's environmental quality division (EQD) prepared an initial study evaluating the proposed project, which included the following statements. The project would divide the land into 2 lots—1 lot of 1.45 acres retaining its R1-10000 zoning, and the second lot of 9.65 acres being rezoned to R-3000 and a 140 unit apartment complex constructed. The rezone to R-3000 would bring the project into conformance with the land use designation allowed under the community plan of low-medium density residential development (10-15 dwelling units per acre). The R-3000 zoning would allow a maximum of 15 dwelling units per acre, or a total of 145 units for the 9.65 acre site. The proposed project would consist of 140 apartments at a density of 14.5 dwelling units per acre on the 9.65 acre lot, housed in 9 two-story buildings, and including 124 units of 2 or more bedrooms and 16 units with 1 bedroom.

The project is bounded on the west by 25th Street, a frontage road to Interstate 5; on the north by two-lane Grove Avenue; and on the east by two-lane 27th Street. Access to the site would be provided by two entrances from Grove Avenue to the north, one entrance from 25th Street to the west, and one entrance to 27th Street from the east. Regional access is provided by Interstate 5 via Coronado Avenue and 25th Street.

Currently, the northern portion is vacant and the southern and eastern portions are occupied by corrals and residences zoned Rl-10000. Land to the north across Grove Avenue is occupied by multi-family residences zoned R-3000. On land to the east are single-family residences and multi-family developments zoned R-3000 and R1-10000, as well as Southwest Junior High School and Interstate 5. Land to the south is occupied by single-family residences and corrals zoned R1-10000.

A study of potential noise impacts was conducted, and it was determined the noise levels from traffic on Interstate 5 and 25th Street would be excessive. However, the developer agreed to incorporate mitigating measures, including the construction of exterior walls and specialized construction techniques for the interior walls, doors, and windows, which would mitigate noise impacts to a level of insignificance.

Regarding traffic, the city's engineering and development department determined the rezone would result in approximately 840 additional average daily trips, which is not considered significant, and no traffic study was necessary. Further, the project is consistent with the community plan land use designation of low-medium residential development.

The initial study included a checklist of potential environmental impacts, indicating no problems in such areas as excess traffic, increased traffic hazards, or the need for new services such as schools or parks.

Accordingly, based on a final report prepared in December 1986, the city planning department's EQD issued a mitigated negative declaration, which determined that an environmental impact report was not required. The declaration indicated the developer had agreed to mitigate the identified noise problems.

Attached to the negative declaration were comments received during the public input period, including a letter from the California Department of Transportation, indicating that the Interstate 5 off-ramp at Coronado Avenue was having congestion problems during peak hours, and recommending the developer mitigate any additional traffic congestion to be determined by a traffic study. The negative declaration responded to this comment by reiterating the statements in the initial study that the rezone would not have a significant impact on traffic and no traffic study was necessary.

*Approval of and Opposition to the Project*

On November 12, 1986, the Otay Mesa/Nestor Community Planning Group approved the project's design, but did not approve the granting of a

permit or rezoning, instead reserving the right to pursue a community park for the property.

On January 5, 1987, the city's subdivision board approved the tentative subdivision map, subject to the condition that if rezoning was denied, the map would be deemed denied. The board found the project was consistent with the community plan which provides for low-medium density residential development; the public services and facilities needed for the project were available or required by condition of the subdivision map; and residential development had been planned for the area and public services programed for installation. Conditions were imposed on the map approval, including payment of park and school impact fees, and construction of a curb and sidewalk on Grove Avenue and 27th Street adjacent to the apartment project.

Also on January 5, 1987, the city planning director approved the application for a planned residential development (PRD) permit, determining the project would not have a significant effect on the environment. The PRD permit was conditioned upon approval by the city council, and required the rezoning to be approved by the city council.

Under San Diego's Municipal Code, the planning director is directed to grant a PRD permit if the proposed use of the property will fulfill an individual and/or community need and will not adversely affect the general or community plan, will not adversely affect persons or property in the area, and will comply with the Municipal Code; and is empowered to impose conditions as necessary to protect the general welfare. (Mun. Code, § 101.0900-E.)

On January 23, 1987, the city's planning department submitted a report to the city's planning commission, recommending that the mitigated negative declaration be certified, and that the commission recommend approval of the rezoning to the city council. The report summarized the issues, stating the rezone was consistent with the low-medium density in the community plan; the proposed parking and access was sufficient; and the noise, traffic and other potentially adverse impacts would be addressed with mitigating measures. The report reiterated many of the statements in the EQD's initial study, and additionally included an observation that the city's parks and recreation department had no plans to acquire the property for open space; i.e., although the department was interested in acquiring a minimum of five acres in the northern portion of the site, no funds were available.

On January 29, 1987, the planning commission voted to approve the rezoning, and further recommended that a work program be considered in

the future for an evaluation of the community's park needs. The commission's minutes indicate that residents and representatives of the community planning group opposed the project, requesting the site be used for a park.

On February 2, 1987, the planning department received a letter from the Sweetwater Union High School District, stating the project would have an adverse environmental impact, and indicating the school board had adopted a resolution in May 1986, requesting a building moratorium in the area because of the already overcrowded schools. The letter observed that although the district had the authority to levy fees on new development projects, the school district opposed any rezoning or other land use amendments which would increase density. The May 1986 school board resolution stated that South San Diego had experienced a tremendous increase in the number of multi-family dwelling units and single-family homes, the schools were experiencing severe overcrowding, and the city council representative had been requested in April 1986 to address the issue of excessive multi-family construction in the South Bay to which request the school district had not received an adequate response. Therefore, the district decided to request the city to cease the issuance of building permits until a resolution of the crowding of educational facilities in South San Diego was resolved.

A resident of the area submitted a letter to the planning commission, received by the city clerk's office on February 5, 1987, which expressed concerns about the project based on the overcrowding created by the number of apartments in the community, pointing out there were already three large apartment complexes in the immediate area, the schools were overcrowded, there were inadequate playgrounds, and there was a hazardous traffic problem on 27th Street. The resident requested the area be zoned low density to allow for playgrounds, and recommended 27th Street be used only for pedestrian traffic to the apartments.

*City Council's Denial of Rezoning*

The rezoning application came before the city council on March 17, 1987. One of the city council members (Ballesteros) requested a continuance in order to explore what could be done to ensure the development of a park in the community, noting that the area was heavily impacted by multi-family housing and had very little park space, that the community planning group had requested the site be acquired for a park, and that rezoning would increase the value of the property.[2] A representative of the parks

---

[2] Ballesteros initially moved that the rezoning be heard concurrently with the PRD permit, until informed the PRD had already been approved by the planning director on January 5, 1987. San Diego's Municipal Code allows for appeals from the planning director to the planning commission, and from the planning commission to the city council, within 10 days after

department informed the city council that there was a need for a park in the area, but that funding was not currently available to purchase the site.

The city council indicated the purpose of the continuance was to encourage the developer to work with the city council on a park for the area; i.e., to permit a park on the site or to develop a park next to the site. Statements were made indicating that in addition to the park issue, there was opposition to the project from the high school district based on increased density, and from residents based on such factors as the impact on the schools, need for street improvements, and danger to children because of the lack of sidewalks. The developer opposed the continuance, stating there was no way a project of its size could solve a regional park problem and the developer had identified an alternative park site, and thus there was nothing which could be solved by the continuance.[3]

The merits of the rezone were addressed at the continued hearing held on March 31, 1987. The developer indicated the project had already been approved and the rezoning was simply to bring the property in line with the general plan designation; the developer would be making all required public improvements and paying park and school fees; the parcel was designated residential in the general plan and at the start of the project the developer was told no funds were available to purchase the property for a park; the site is not suited for park usage because of its noise level; and an alternative site had been identified across the street from the project.

Various residents of the area testified in opposition to the development, expressing concerns which included the following: density of the project; aesthetic impact on surrounding homeowners; need for a park in the area and the site should be saved for a park until the funds could be acquired; impact on overcrowded schools; difficulties apartment owners had in renting apartments indicating no current need for apartments; 27th Street was extremely narrow with no sidewalks, causing traffic bottlenecks and endangering students attending the junior high school, some of whom had already died and been injured in traffic accidents on the street; existence of a high density apartment complex directly across the street which generates heavy speeding traffic; and several apartment projects had been built in the area within the last few years.

The developer responded that he had met with the residents and tried to explain to them that the project was structured so the major entrances were

---

the decisions. (Mun. Code, §§ 101.0900-F, 101.0900-G, 101.0230, 101.0240.) Apparently, the planning director's approval of the PRD permit (conditioned on the rezoning) was not appealed here.

[3] In its writ of mandate petition, the developer alleged Ballesteros requested that Mira purchase an alternative park site for the city, costing about $300,000 to $400,000, and Mira responded it was financially unable to do so.

on 25th Street, and only one of the buildings would be serviced by 27th Street, and that with the development street and other public improvements for the area would be upgraded.

Ballesteros expressed the views that since land in the area was relatively inexpensive, it had been overdensified, transformed from a semi-rural community into a highly densified urban area without the infrastructure (schools and other services) keeping pace with the sudden demand; there are no parks in the area and very little remaining open space; it is difficult to say all the increased traffic would stay on 25th Street; and 27th Street was substandard without any sidewalks or improvements and was essentially going to remain the same. Ballesteros recommended that the staff be directed to develop a plan for the city's purchase of the adjacent property to develop a park and to mitigate the traffic problem, and thereafter the city council might be able to move forward with the rezoning.

After concerns were raised as to whether the city council could properly consider the issue of the city's acquisition of land for a park in the context of a rezoning application, the city council was advised by the city attorney that the city council should *not* consider the park issue, since to do so would raise the possibility of an inverse condemnation lawsuit, and the city council should not deny the application on the basis that the site might be the only vacant site available for a park. However, the city council was advised it could properly consider matters associated with congestion in the area— i.e., inadequacy of the schools, streets, public improvements such as sidewalks, crime. These matters could support a rejection of the rezoning application even though its density was consistent with the general plan, on the basis that the rezoning was premature until the community problems had been resolved.

Ballesteros moved for a continuance rather than a denial of the application, stating that the infrastructure problems were not impossible to overcome and could be resolved with more work, and at the same time it would not hurt to explore sources of funding to acquire park land.

The developer responded, opposing the continuance, stating the issues apart from the park issue had not been pointed out earlier, the issue had been to try and preserve the site as a park, and to deny the rezoning on that basis would be wrong.

Thereafter the city council voted to deny the rezoning application, with city council members commenting that they recognized they were not allowed to reject the application on the basis of the park issue but were relying on the infrastructure problems.

*The Housing Element of the General Plan*

The housing element of San Diego's general plan (hereafter housing element) was adopted by the city council by resolution in September 1981. The housing element states its housing goals should be implemented, inter alia, through zone designation immediately upon adoption of plans. It defines "low-medium density" as 10 to 15 units per acre, and states land use regulations should be amended to assure development does not fall below or exceed the density range. Further, the housing element, based on 1975 and 1978 data, indicates the Otay Mesa/Nestor area has an inadequate attached and rental housing supply, and incentives for new rental housing production should be developed through community plans.

The housing element recognizes that its goals must be consistent with other elements of the general plan and other plans, and that when conflicting circumstances occur a determination must be made on a case-by-case basis by decisionmakers. Specifically, the housing element is related to infrastructure adequacy and quality of life concerns, including transportation, public facilites, services and safety, and recreation and conservation elements.

The housing element refers to the community plans, which provide detailed land-use designations and development programs tailored to the characteristics of each subarea. The general plan establishes a framework for the development of the subarea plans by indentifying goals, standards and criteria relating to the need for essential facilities and qualitative policies.

*The Community Plan*

The Otay Mesa/Nestor community plan (hereafter community plan) was adopted by the city council by resolution in December 1978. The community plan emphasizes the importance of rezoning to implement its land use proposals, stating it may require subsequent public hearings to determine whether or not to rezone property so that it is consistent with community plan proposals, as set forth in section 65860 and city council policy 600-6 (1967).

The community plan states it is *only a guideline* and although it has been prepared to guide development through 1995, *circumstances may arise requiring communtiy plan update and community conditions should be continually monitored to ensure the plan remains timely*. Further, it states the achievement of the desired environment rests ultimately with the residents' desires and initiative; the implementation of proposals will require careful and diligent coordination between community leaders, developers interests,

and government agencies; and the citizen committee must continue to monitor the community plan's appropriateness to changing community desires and respond accordingly, and should review all future rezonings, PRD's, etc. and make recommendations on their conformity with the community plan.

The community plan states it has been coordinated with the general plan, and should differences occur between the two plans, they may be resolved through public hearings.

Regarding the relationship between development and public facilities, the community plan refers to city council policy 600-10 (1971) which provides development should proceed only if adequate public facilities were assured, and policy 600-22 (1977 rev.) which is concerned with school overcrowding and requests information from the school district to facilitate development decisions. The community plan generally proposes to monitor development in relation to the availability of public services, and to that end states building permit issuance should be monitored to prevent premature and uncoordinated development.

More specifically, regarding housing, the community plan states it seeks to develop sufficient housing to accommodate expected increases in population at an appropriate density to avoid overtaxing public facilities. Regarding parks, the community plan's objectives are to provide adequate park and recreation facilities to meet expected population increases; to consider the impact of new development on existing recreation facilities; and to develop recreational facilities fitted to the needs and desires of area residents. Regarding schools, the community plan proposes to expand school programs to accommodate the needs of all age groups. Regarding transportation, the plan's objectives include minimizing areas of conflict between pedestrians, bicycles and vehicular traffic; and encouraging the completion of sidewalks.

Mira's proposed site is designated "low-medium" density in the community plan, and is located in what has been denominated "Sector 2."

The community plan objectives for sector 2 are to develop it as the "employment/business" center of the Otay Mesa/Nestor community, utilizing the excellent freeway access and railroad availability to the highest degree possible, and to provide housing close to the employment base compatible with locational considerations. The community plan recognizes that existing residential properties must be protected from undue nuisances resulting from the development of sector 2 which can be expected to generate higher than normal noises, traffic, and other adverse conditions. The

community plan anticipates that considerable industrial employment is expected, and development of low-medium density housing should utilize the majority of presently vacant land.

Analysis

I

■ A zoning decision is a legislative act and it should be overturned only if it has no reasonable relation to the public welfare. (*Toso* v. *City of Santa Barbara* (1980) 101 Cal.App.3d 934, 943 [162 Cal.Rptr. 210].)
■ Mira argues the rezone denial was arbitrary and discriminatory since (1) the housing element of the general plan requires the city to zone the property for low-medium density as requested in Mira's R-3000 rezone application, and (2) the denial was improperly designed solely to decrease or freeze the property's value to allow the city to later acquire the property for a park.

*Consistency Between Zoning and General Plan*

■ Initially, we address the city's argument it was not obligated to render a zoning decision consistent with the housing element and community plan.

Section 65860 imposed a duty on local governments to make their zoning ordinances consistent with the general plan by January 1974, and requires them to continue to amend zoning ordinances consistently with any amendments to the plan.[4] However, section 65803 generally exempts charter cities from the provisions of the state zoning law, unless the zoning regulations (contained in chapter 4 of the planning and zoning law) specifically make reference to charter cities or the charter city adopts the chapter's provisions by charter or ordinance.[5] Effective January 1, 1979, section 65860,

---

[4] Section 65860, subdivision (a) states: "County or city zoning ordinances shall be consistent with the general plan of the county or city by January 1, 1974. A zoning ordinance shall be consistent with a city or county general plan only if:
"(i) The city or county has officially adopted such a plan, and [¶](ii) The various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in such a plan."
Section 65860, subdivision (b) provides for a resident or property owner to bring an action in the superior court to enforce compliance with the provisions of subdivision (a) within 90 days of the enactment of a new or amended zoning ordinance. Section 65860, subdivision (c) states: "In the event that a zoning ordinance becomes inconsistent with a general plan by reason of amendment to such a plan, or to any element of such a plan, such zoning ordinance shall be amended within a reasonable time so that it is consistent with the general plan as amended."
[5] Section 65803 states: "Except as otherwise provided, this chapter shall not apply to a charter city, except to the extent that the same may be adopted by charter or ordinance of the city."

subdivision (d) extended the section's coverage to charter cities having a population of at least 2,000,000. (See *City of Los Angeles* v. *State of California* (1982) 138 Cal.App.3d 526, 531-532 [187 Cal.Rptr. 893].)[6]

On appeal, the parties do not dispute San Diego is a charter city with a population under 2,000,000, and which has not adopted the provisions of the chapter by ordinance or charter. Thus, based on the exemption in section 65803, San Diego was not required to follow the mandate of section 65860 to make its zoning ordinances consistent with the general plan, and to amend its zoning ordinances a reasonable time after any inconsistent amendments. (See *Verdugo Woodlands Homeowners etc. Assn.* v. *City of Glendale* (1986) 179 Cal.App.3d 696, 704 [224 Cal.Rptr. 903]; *City of Los Angeles* v. *State of California, supra,* 138 Cal.App.3d at pp. 533-535.)

■ However, merely because San Diego is exempt from this affirmative mandate to change its zoning ordinances, this does not necessarily mean that when determining whether the city's denial of a rezone application was an abuse of discretion, we should not look for consistency of the action with the city's land use plan. ■ ■ ■ Since the city was required in chapter 3 of the planning and zoning law to adopt a general plan including a housing element (§§ 65700, subd. (a), 65302, subd. (c), 65583, 65587),[7] it makes sense that we should examine the plan to determine whether the City's zoning decision was not an abuse of discretion. (See generally *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d

---

[6] Section 65860, suddivision (d) states: "Notwithstanding Section 65803, this section shall apply in a charter city of 2,000,000 or more population to a zoning ordinance adopted prior to January 1, 1979, which zoning ordinance shall be consistent with the general plan of such city by July 1, 1982."

[7] We reject Mira's argument, emphasized at oral argument, that under sections 65583 and 65587, the city's zoning decision was a mere ministerial duty to conform the zoning to multifamily residential as designated in the housing element.

Section 65583 states, inter alia, that the housing element should contain an "inventory of land suitable for residential development, including vacant sites and sites having potential for redevelopment, and an analysis of the relationship of zoning and public facilities and services to these sites" (subd. (a)(3)) and should "[i]dentify adequate sites which will be made available through appropriate zoning and development standards and with public services and facilities needed to facilitate and encourage the development of a variety of types of housing for all income levels. . . ." (subd. (c)(1)). Section 65587, subdivision (c) states: "If a court finds that an action of a city, county, or city and county, which is required to be consistent with its general plan, does not comply with its housing element, the city, county, or city and county shall bring its action into compliance within 60 days."

We do not construe these sections as having the effect of removing the city's power and duty to exercise its discretion in making a zoning decision based on the public welfare. As we discuss below, the housing element acknowledges the necessity of balancing the various goals of the plan, and that when conflicts arise a determination must be made on a case-by-case basis. Further, the legislative scheme does *not* contemplate that a city's plan has the force of a zoning enactment which only requires the city to engage in the ministerial duty of passing the zoning ordinance. (See §§ 65302, 65860 subd. (a)(ii).)

988, 998 [165 Cal.Rptr. 514] [legislative scheme supports implied statutory requirement that all decisions involving growth of state should be guided by an effective planning process that includes local plan].)[8]

In any event, regardless of whether San Diego was directly mandated to conform its zoning ordinances to its land use plan, or whether the land use plan is merely a factor to consider in evaluating zoning decisions, here we can readily conclude that the city council's zoning decision was not inconsistent with the housing element of the general plan and community plan. Even if the terms of section 65860 were applied under subdivision (a) (ii), a zoning ordinance is consistent with a plan only if the "various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in such a plan." This provision, as well as the terms of the housing element and community plan, do not envision the city will blindly adopt the designated densities in the plan, but rather contemplate that a proposed zoning ordinance will be evaluated in light of the overall goals of the plans and current conditions. (See facts in *Toso* v. *City of Santa Barbara, supra,* 101 Cal.App.3d at pp. 940-941; *Ensign Bickford Realty Corp.* v. *City Council* (1977) 68 Cal.App.3d 467, 471 [137 Cal.Rptr. 304] [although proposed rezoning in conformance with general plan, its adoption would not serve general welfare at that time].) As we explain below, the plans call for coordination between housing development and the corresponding need for the provision of public services and improvements. There is substantial evidence that the R-3000 zoning ordinance requested by Mira would cause higher density development out of pace with the needed public improvements and services. This evidence supports a determination that, consistent with the plans, the property should not at the present time be rezoned for a higher density.

As stated in the reports prepared by the city, Mira's rezone request was consistent with the community plan's designation of the property for low-

---

[8] In *Friends of "B" Street* v. *City of Hayward, supra,* 106 Cal.App.3d 988, the court held there was an implied statutory requirement that the city conform its proposed public works projects to its general plan. For a general discussion of the statutory zoning and planning scheme, see also *Verdugo Woodlands Homeowners etc. Assn.* v. *City of Glendale, supra,* 179 Cal.App.3d at pages 702-703, and *Elysian Heights Residents Assn., Inc.* v. *City of Los Angeles* (1986) 182 Cal.App.3d 21, 27-28 [227 Cal.Rptr. 226]. In the *Verdugo* case, the court, although suggesting the Legislature might want to reevaluate the wisdom of the exemption, held that the section 65803 exemption allowed the charter city of Glendale to issue a permit to developers for a higher density project than provided for in the city's land use plan. Taking a different approach in a different factual context, the court in the *Elysian* case held the nonexempt (based on its population) City of Los Angeles, could issue building permits contrary to the density in the land use plan (but in conformance with existing zoning), since the statutory consistency requirement had been imposed on zoning changes and subdivision approvals, but not on building permits. The factual situations and the analysis in the *Verdugo* and *Elysian* cases are not directly applicable to resolving the issues before us in this case.

medium density, defined in the housing element as meaning 10 to 15 dwelling units per acre. Further, there are statements in both the housing element and community plan indicating the area should be developed with multi-family units. However, the plans are based on data compiled in the 1970's. The community plan is careful to emphasize it is only a guideline and the citizens should continually monitor building permits and rezoning applications, to ensure the plan is updated and its goals implemented in accordance with changing conditions and the desires of the residents. Further, the community plan repeatedly states its objective is to ensure development is coordinated with the provision of public services. Similarly, the housing element recognizes its goals must be coordinated with other elements, including infrastructure development, and when conflicts arise decisions must be made on a case-by-case basis.

There is evidence in the record that public improvements and services have not kept pace with the development of multifamily units in the Otay Mesa/Nestor area. This evidence includes residents' testimony regarding the inadequacy of the parks, lack of sidewalks[9] and narrowness of 27th Street causing traffic bottlenecks and safety hazards, and the school district's letter and resolution requesting a building moratorium until school overcrowding is resolved. Consistent with the balancing concerns indicated in the housing element and community plan, the city council acted well within its discretion in denying the rezone application until these inadequacies are resolved.

*Prior Approvals*

We note the city was not required to follow the findings of the planning commission and other city agencies which recommended approval of the rezone application and which conditionally approved the planned residential development permit and subdivision map, finding no adverse effects on traffic or other aspects of the environment. It was the city's perogative to give greater weight to the statements of those directly affected by the development—i.e., the residents and the school district.[10]

---

[9] Although the tentative subdivision map was conditioned on the construction of a sidewalk adjacent to the apartment complex on 27th Street, there is no indication the development would result in the construction of sidewalks the entire length of the street.

[10] We note further there is nothing in the San Diego Municipal Code which indicates the city council's consideration of the rezone application should be restricted or affected by the city's conditional granting of the PRD permit and the conditional approval of the tentative subdivision map. The Municipal Code provides for the consideration of zoning applications by the city council—i.e., the planning commission after a public hearing makes a recommendation to the city council, and the city council then holds a hearing where it may adopt or

*Consideration of Lack of School Facilities*

■ Mira argues that under section 65996 (contained in chapter 4.9 of the planning and zoning law), the city council could not rely on the school overcrowding issue as a basis for denying the rezone application. Section 65996 states: "The following provisions shall be the exclusive methods of mitigating environmental effects related to the adequacy of school facilities when considering the approval or the establishment of conditions for the approval of a development project, as defined by Section 65928 of the Government Code . . . .", and then lists the various statutory provisions which provide methods for the development of school facilities (including imposition of fees and/or dedication of land as a condition to approval of a residential development on the developer under § 65974). Section 65996 concludes by stating: "*No public agency shall,* pursuant to Division 13 (commencing with Section 21000) of the Public Resources Code or Division 2 (commencing with Section 66410) of this code, *deny approval of a project on the basis of the adequacy of school facilities.*" (Italics added.) Public Resources Code section 21000 et seq. addresses approval of projects conditioned upon the mitigation of environmental effects. Section 66410 et seq. addresses approval of subdivision maps.

A development project is defined in section 65928 (chapter 4.5 of the planning and zoning law) as including "a project involving the issuance of a permit for construction. . . ." Further, section 65931 defines "project" as meaning "any activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

*Landi* v. *County of Monterey* (1983) 139 Cal.App.3d 934, 936-937 [189 Cal.Rptr. 55], holds that a rezoning is not a "development project," and thus sections 65950 and 65956 (in chapter 4.5)—providing that a develop-

reject the recommendation or take such action as it deems in the public interest. (Mun. Code, §§ 101.0205, 101.0206, 101.0207, 101.0208.)

Regarding the PRD permit, the Municipal Code states: "The density of a Planned Residential Development shall not exceed the density as prescribed in an adopted community plan, any other adopted plan, *or the underlying zone, whichever is less.* . . ." (Mun. Code, § 101.0900-B-1.) The PRD permit here expressly states the project was conditioned upon the approval of the city council.

Regarding the tentative subdivision map, the Municipal Code states that a final map shall be presented to the city when all conditions of the tentative map have been met. (Mun. Code, § 102.0313; see also § 66458.) The tentative map here is expressly conditioned upon the rezoning, and states if the rezoning is denied, the map is deemed denied.

Thus, the PRD permit and tentative map approval leave the control of approval of a development requiring rezoning to the city council via the zoning process. (See *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 795 [132 Cal.Rptr. 386, 553 P.2d 546].)

ment project shall be deemed approved if the agency fails to approve or disapprove the project with one year—are not applicable to a rezoning application. *Landi* cites *Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 514 [169 Cal.Rptr. 904, 620 P.2d 565], the latter case which holds zoning ordinances are legislative, not adjudicative, acts and thus they may be enacted by initiative. *Arnel* reaffirms the well-established rule that a zoning decision—which makes land-use policy—is legislative in nature even if made in the context of specific, relatively small parcels of private property. In contrast, subdivision approvals, variances, and conditional use permits—which apply established policies to specific projects—are adjudicative in nature. (*Id.* at pp. 514, 516-519, 522-523.)

The *Landi* holding and the *Arnel* analysis are applicable here. That is, section 65996 by its terms refers only to approval of development projects and makes no reference to zoning decisions. Although from a developer's perspective a zoning decision may have the same impact as a decision on a development permit, nevertheless there is a long-recognized historical distinction between zoning and other land use decisions. Zoning decisions are afforded more deference than an agency's adjudicative decisions. (See *Arnel Development Co.* v. *City of Costa Mesa, supra,* 28 Cal.3d at p. 522; cf. §§ 65800, 65804 [legislative intent that local governments exercise maximum control over zoning matters].) Accordingly, we will not broaden the meaning of section 65996 beyond its express terms.

We conclude the city was not restricted by the terms of section 65996 when making the zoning decision, and could deny the application based on the lack of school facilities.

In any event, even if arguendo the school issue could not be used to support the denial, the other public improvements factors (i.e., traffic and safety problems on 27th Street) provide substantial evidence to support it.

*The Park Issue*

 Independently of a consideration of the need for a specific park site, the city could still properly deny the rezone request on the basis that multi-family housing development had generally outpaced the development of recreational space. Accordingly, the city council could determine that such development which would further increase population should be delayed until there were assurances parks would also be developed.

The consideration of the need for park space in the denial of the rezone application here is not akin to the situation in the case cited by Mira, *Kissinger* v. *City of Los Angeles* (1958) 161 Cal.App.2d 454, 458-462 [327

P.2d 10]. In the *Kissinger* case, the city council anticipated that it needed to acquire the plaintiffs' property for airport expansion, and to that end it rezoned the property from multifamily to single-family in an emergency ordinance, without notice or a public hearing, thereby substantially decreasing the value of the property. The court concluded the rezoning was a discriminatory exercise of the city's police power without due process and without payment of compensation for the taking. The court noted the evidence contradicted the city's purported justification of reducing the number of residents subject to flight hazards, since none of the neighboring properties were rezoned. Instead, the evidence established the city intended to condemn the property and wanted to acquire it for a lesser price.

Here, the city did not rezone property and thereby lower its market value, but rather denied a rezone application which simply maintained the status quo. The general rule is that a public agency should not engage in inequitable zoning practices as a prelude to public acquisition, or to evade condemnation proceedings. (See *HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508, 516-517, fn. 14 [125 Cal.Rptr. 365, 542 P.2d 237].) Two illustrative cases, including the *Kissinger* case, were aptly summarized in *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 120 [109 Cal.Rptr. 799, 514 P.2d 111], as follows: "One involved an unconstitutional attempt to rezone the plaintiff's property so that it could be acquired for a public use upon payment of a lower price (*Kissinger* v. *City of Los Angeles* (1958) 161 Cal.App.2d 454, 462 [citation]), and the other upheld a claim of inverse condemnation because the county had announced its intention to condemn plaintiff's land for an airport, rezoned and restricted the use of that property so that its value would be depressed in the event of future public acquisition, refused permission to subdivide, and finally abandoned the airport project altogether. (*Peacock* v. *County of Sacramento* (1969) 271 Cal.App.2d 845 [citation].)" The zoning denial here did not decrease the value of the property, nor did it preclude use of the land. (Cf. *Redevelopment Agency* v. *Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73, 81-82 [185 Cal.Rptr. 159] [denial of permit to change from single-screen to multiscreen theatre, on basis that it was inconsistent with redevelopment plans for area].)

Further, a landowner has no vested right in existing or anticipated zoning; thus, Mira did not have a right to obtain a rezoning and thereby obtain an increase in the market value. (See *Toso* v. *City of Santa Barbara, supra,* 101 Cal.App.3d at pp. 944, 952; *Ensign Bickford Realty Corp.* v. *City Council, supra,* 68 Cal.App.3d at pp. 477-479; *Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d at p. 796.) ■ A zoning ordinance may be invalid if it discriminates against a parcel of land without a rational reason in the public benefit (see *Viso* v. *State of California* (1979)

92 Cal.App.3d 15, 22 [154 Cal.Rptr. 580]), or if it deprives the landowner of substantially all reasonable use of his property (*Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 277 [157 Cal.Rptr. 372, 598 P.2d 25], overruled on other grounds in *First English Evan. Luth. Ch.* v. *Los Angeles Cty.* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 259-268, 107 S.Ct. 2378, 2382-2389][11]). On the other hand, if supported by the public welfare, a government may enact zoning which decreases the value of land and zones two similar parcels of land differently. (*Ensign Bickford Realty Corp.* v. *City Council, supra,* 68 Cal.App.3d at pp. 477-478.) A government may, absent extraordinary delay or deprivation of use of the land, engage in good faith planning activities and decisionmaking concerning the potential public use of a site (i.e., designate the property as a site to be studied for possible public acquisition, designate a site for public purposes in a general plan, or commence eminent domain proceedings which are then abandoned), without being subject to an inverse condemnation action, even if the value of the land fluctuates during the process. (Compare *Agins* v. *Tiburon* (1980) 447 U.S. 255, 263, fn. 9 [65 L.Ed.2d 106, 113, 100 S.Ct. 2138], *Guinnane* v. *City and County of San Francisco* (1987) 197 Cal.App.3d 862, 867 [241 Cal.Rptr. 787], and *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d at pp. 119-120, with *Jones* v. *People* ex rel. *Dept. of Transportation* (1978) 22 Cal.3d 144, 152-153, 155 [148 Cal.Rptr. 640, 583 P.2d 165].)

■ To summarize these rules, although a landowner does not have a right to existing or anticipated zoning and the city may use its police power to enhance the public welfare, neither may the city use its zoning power to enhance its position in, or to evade, anticipated condemnation proceedings, or to unreasonably discriminate against or eliminate the value of a parcel of land. The circumstances of this case do not show the city gained any unfair advantage or otherwise exceeded its police power. That is, the denial maintained the zoning status quo and took nothing away from Mira to which it was entitled.

Alternatively, as with the school issue, even if the city should not have considered its desire to acquire the property for a park in denying the rezone, the record establishes substantial other grounds for denial based on the residents' testimony regarding problems with safety and traffic conditions on 27th Street. We need not evaluate the subjective motives of the city council members in denying the rezone application, since other objective

---

[11] The *First English* case overrules *Agins* to the extent it limited a landowner deprived of all use of his land to actions for declaratory relief or mandamus to invalidate the regulation, and did not allow inverse condemnation actions for damages. Under *First English,* a landowner who has been deprived of all use of his property may sue for damages without first obtaining a judgment invalidating the ordinance, even if the taking is "temporary" in that the invalidated ordinance is subsequently repealed.

evidence supports the legitimate denial of the application. (*Ensign Bickford Realty Corp.* v. *City Council, supra,* 68 Cal.App.3d at pp. 478-479.)[12]

## II

■ Mira also argues that under section 65589.5, the city should have made written findings, and that even if the city had made written findings there is no evidence to support the denial of approval to proceed with the development.

Section 65589.5, contained in chapter 3 of the planning and zoning law, states: "*When a proposed housing development project complies with the applicable general plan, zoning, and development policies in effect* at the time that the housing development project's application is determined to be complete, but the local agency proposes to disapprove the project or to approve it upon the condition that the project be developed at a lower density, the local agency shall base its decision regarding the proposed housing development project upon *written findings supported by substantial evidence* on the record that both of the following conditions exist:

"(a) The housing development project would have a specific, adverse impact upon the public health or safety unless the project is disapproved or approved upon the condition that the project be developed at a lower density.

"(b) There is no feasible method to satisfactorily mitigate or avoid the adverse impact identified pursuant to subdivision (a), other than the disapproval of the housing development project or the approval of the project upon the condition that it be developed at a lower density." (Italics added.)

Further, section 65589.6 provides that the burden is on the city to prove that its decision has conformed to the conditions in section 65589.5.

Section 65700 contains an exemption for charter cities from the provisions of chapter 3, *except* charter cities are required to adopt a general plan, including a housing element, as mandated by section 65300 et seq. Section

---

[12] In any event, the city council members expressly stated they were not relying on the park issue. The record does not support Mira's suggestion in its brief that the city council was *only* concerned with the park issue, and discussed the other issues after being advised it should not consider the park issue, implying the other issues were a subterfuge for the city council's sole desire to freeze the value of the site for condemnation purposes. To the contrary, even before the city attorney advised exclusion of the park issue, Ballesteros referred also to the problems of overdensification, lack of infrastructure to keep pace with the demand, and the traffic problems and lack of sidewalks on 27th Street. Further, the residents' testimony shows the other issues were of real concern, unlike the situation in the *Kissinger* case.

65302 states the general plan must include a housing element as provided in article 10.6, and the written findings provision in section 65589.5 is contained in article 10.6. Thus, arguably section 65700's exemption for charter cities could be interpreted as not extending to the written findings provisions of section 65589.5.[13] (See generally, *Buena Vista Gardens Apartments Assn.* v. *City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 295-296 [220 Cal.Rptr. 732], discussing San Diego's housing element.)

Assuming arguendo section 65589.5 applies to charter cities, nevertheless we interpret its terms as not applicable to the instant case since Mira's proposed development required a rezoning, and thus the development was not in compliance with the "zoning . . . polic[y] in effect at the time that the housing development project's application is determined to be complete. . . ." Such an interpretation is consistent with the well-established rule, discussed earlier in this opinion, that zoning decisions are legislative, not adjudicative, acts, and do not require written findings supported by substantial evidence, but need only be reasonably related to the public welfare. (See *Arnel Development Co.* v. *City of Costa Mesa, supra,* 28 Cal.3d at p. 522, and dis. opn. at p. 531; *Toso* v. *City of Santa Barbara, supra,* 101 Cal.App.3d at pp. 942-943; *Ensign Bickford Realty Corp.* v. *City Council, supra,* 68 Cal.App.3d at pp. 474-475; Mun. Code, § 101.0210 [proceedings to attack rezone decision shall be under Code Civ. Proc., § 1085; proceedings to attack permit decision shall be under Code Civ. Proc., § 1094.5].)

We recognize that section 65589.5 could arguably be interpreted as applying here since the proposed development, although not in conformance with the existing zoning ordinance, was in conformance with the zoning designated in the community plan. Since this interpretation would be contrary to the traditional treatment of zoning decisions reaffirmed in the *Arnel* case, we decline to adopt such an interpretation absent a clear legislative statement to that effect.

Even assuming arguendo that section 65589.5 is applicable to the city's zoning decision and the city should therefore have rendered written

---

[13] Section 65700 states: "(a) The provisions of this chapter shall not apply to a charter city, except to the extent that the same may be adopted by charter or ordinance of the city; except that charter cities shall adopt general plans in any case, and such plans shall be adopted by resolution of the legislative body of the city, or the planning commission if the charter so provides, and such plans shall contain the mandatory elements required by Article 5 (commencing with Section 65300) of Chapter 3 of this title.

"(b) Notwithstanding subdivision (a), the provisions of Sections 65590 and 65590.1 shall be applicable to charter cities."

A housing element is one of the mandatory elements required by article 5 of chapter 3 of the planning and zoning law, as indicated in section 65302, which states: "The plan shall include the following elements: . . . (c) A housing element as provided in Article 10.6 (commencing with Section 65580)." The written findings provision (§ 65589.5) is contained in article 10.6.

findings, the failure to do so would be harmless error in this case making a remand unnecessary. As delineated in our discussion above, there is substantial evidence that the project would have a specific, adverse effect upon pedestrian safety and traffic conditions on 27th Street, crowding at the schools, and the lack of park space. It is apparent from the transcript of the city council meeting that this was the basis of the city council's decision. Further, these problems by their nature require time, effort, and the expenditure of funds (i.e., construction of sidewalks, widening of the street, construction of schools, acquisition of park sites). Thus, the evidence supports an inference that there is no feasible method to immediately mitigate or avoid the adverse impact so as to allow approval of the project at the time of application.[14]

Finally, we reach this conclusion regardless of whether we use the substantial evidence standard (Code Civ. Proc., § 1094.5, for quasi-judicial decisions) or the arbitrary and entirely without evidentiary basis standard (Code Civ. Proc., § 1085). (See *Karlson v. City of Camarillo* (1980) 100 Cal.App.3d 789, 798 [161 Cal.Rptr. 260].) The evidence amply establishes the city council did not abuse its discretion in denying the rezone application.

### DISPOSITION

The judgment is affirmed.

Todd, J., and Benke, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 1, 1989.

---

[14] One council member commented: "What is relevant is that the streets in the area are not up to standard, the school is fifty percent over capacity and we are not under any obligation to approve this rezone or any other rezone until those problems are addressed. They are not going to be addressed in a 90 day continuance. They haven't been addressed in 40 years. . . . And, if they want to come back at a later date—if we can address the widening and the sidewalks and the school availability and then perhaps we would be able to give them a different decision at another date."