[No. E011748. Fourth Dist., Div. Two. Aug. 5, 1993.]

CORONA-NORCO UNIFIED SCHOOL DISTRICT, Plaintiff and Appellant, v.
CITY OF CORONA et al., Defendants and Respondents;
JOSEPH DeLEO, JR., Real Party in Interest and Respondent.

**COUNSEL**

Parker, Covert & Chidester, Clayton H. Parker, Spencer E. Covert and Jonathan J. Mott for Plaintiff and Appellant.

Best, Best & Krieger, Barton C. Gaut, Dallas Holmes and Brant H. Dveirin for Defendants and Respondents.

Clayson, Mann, Arend & Yaeger and David R. Saunders for Real Party in Interest and Respondent.

OPINION

DABNEY, J.—Petitioner Corona-Norco Unified School District (District) filed a petition for writ of mandate against the City of Corona and its city council (collectively, City). The petition challenged the City's approval of a zone change for a residential project on the grounds that: (1) the zone change was inconsistent with the City's general plan (General Plan); and (2) the City had failed to conduct an adequate review of the project under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). The trial court concluded the zone change did not violate the requirement of consistency with the General Plan and found the District had failed to exhaust its administrative remedies as to its CEQA claims. The trial court entered judgment in favor of the City. In its appeal from the judgment, the District repeats its consistency and CEQA challenges.

FACTS

*The Parties.*

The District is the public school district responsible for providing public education and school facilities in Corona and adjacent areas.

The City is the local governmental entity charged with the planning and zoning of residential, commercial, and industrial development in Corona. The City has adopted a general plan for local development.

Real party in interest Joseph DeLeo, Jr., is the developer of the property for which the City approved a zone change.

*The Zone Change.*

DeLeo submitted an application to the City for a change of zone for 105.5 acres of land in an area that was then unincorporated.[1] The City designated the proposal Zone Change 90-22. The application requested changing the zone to R-1-20 (single family residential with a 20,000 square feet minimum lot area).

The City's planning commission held public hearings on the application on October 23, 1990, after publishing notice of the hearing on October 2, 1990. The City's staff conducted an initial study of the project under CEQA. The study "identified potentially significant effects on the environmental

---

[1]Annexation proceedings have since taken place. The District does not challenge the annexation.

[*sic*]" but concluded that "revisions in the project plans or proposals made by or agreed to by the applicant would avoid the effects, or mitigate the effects to a point where clearly no significant effects would occur." The staff recommended adoption of a mitigated negative declaration. The environmental checklist prepared for the project asked if the proposal would have an effect upon or result in a need for new governmental services. The box next to schools was checked "no."

The City's community development department recommended that the City approve the application. The department's report stated, "The proposed change of zone is in conformity with the general plan map and report for the following reason: [¶] a). The General Plan land use designation of low density residential permits a density range of 0-6 dwelling units per acre. The proposed pre-zone permits a maximum of two dwelling units per acre which is within the permitted density range."

On January 24, 1991, the city clerk issued a notice of public hearing to be held on February 20, 1991. The notice announced that the city council would consider the planning commission's recommendations for approval of the application for zone change and for a mitigated negative declaration for the project. At the meeting on February 20, 1991, the city council approved the zone change and instructed the city attorney to prepare the appropriate ordinance. The District did not appear at the hearing.

On September 18, 1991, and September 26, 1991, the District sent letters to the city council requesting that the following condition be imposed on the project: " 'Pursuant to the requirement of the General Plan of this city, developer must receive a certification from the Corona-Norco Unified School District that the school district has adequate capacity for grades Kindergarten through grade 12 to provide schools for the students to be residing within this development. For this certification, developer shall agree to be part of the Community Facilities District providing construction funds on a per dwelling unit basis to be utilized by the school district for capital outlay purposes or developer shall enter into any other financial transaction where adequate schools will be provided to the satisfaction of the Board of Education of Corona-Norco Unified School District.' "

On September 25, 1991, the City published notice that it was considering adopting an ordinance to change the zone for the project at its October 2, 1991, meeting. At that meeting, counsel for the District requested that the condition set forth in the District's letters be included as a condition of approval of the project. The city council adopted Ordinance No. 2072 approving the zone change and also adopted a mitigated negative declaration

for the project. The city council did not adopt the District's proposed condition.

*Mandate Proceeding.*

The District filed a petition for writ of mandate challenging the City's approval of the zone change. The District contended the zone change was inconsistent with the General Plan and had been approved in violation of CEQA requirements because the impact on schools of a large residential project was not considered or mitigated.

In the petition, the District alleged that its educational facilities were seriously overcrowded; it was using year-round schooling and portable classrooms to make maximum use of its facilities; it was unable to mitigate the adverse effects of the overcrowding; development under the zone change would have an adverse effect on the District's already inadequate and overcrowded facilities; the zone change would result in hundreds of new students requiring new classrooms and other support facilities; the District lacked financial means to mitigate the impact of new development on its facilities; state law limited the amount of developer fees the District could impose on new development projects to $1.58 per square foot of new construction; the District's estimate of the impact of new residential construction on its facilities was $15,036 per dwelling unit; state funding for new school construction was presently nonexistent; no alternative funding mechanisms were in place; and the District had no authority to use alternative funding mechanisms without the cooperation of developers and property owners. The District further alleged that the zone change "fail[ed] to incorporate sufficient terms and conditions to assure that adequate school facilities [would] be provided [and] . . . falsely assume[d] that developer fees alone [would] mitigate the school impacts."

In the second cause of action, the District alleged that the City violated CEQA requirements in approving the zoning change. The District alleged that the City: (1) failed to describe adequately the significant environmental effects of the zone change; (2) failed to address the cumulative impact of this and other closely related and reasonably foreseeable future projects; (3) failed to describe feasible mitigation measures to minimize the impact of the proposed project on school facilities and services; (4) failed to consider alternatives to lessen the adverse impacts; (5) failed to respond to written and oral comments; and (6) adopted findings not supported by the record.

The City and DeLeo opposed the petition on the ground the zone change was consistent with the General Plan, and the General Plan did not require

the City to impose additional funding under the terms demanded by the District. The City and DeLeo also asserted the District had failed to exhaust its administrative remedies under CEQA and failed to participate in the approval process and in public hearings.

The court denied the petition on the grounds the zone change was consistent with the General Plan,[2] and the General Plan did not require denial or additional funding for schools. The court ruled the CEQA challenge was barred by the District's failure to exhaust administrative remedies.[3]

## DISCUSSION

### I. *Consistency Challenge*

#### A. *Standard of Review.*

The enactment of a zoning ordinance is a quasi-legislative decision. (*Mitchell* v. *County of Orange* (1985) 165 Cal.App.3d 1185, 1191-1192 [211 Cal.Rptr. 563]; *Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 799 [161 Cal.Rptr. 260].) Courts defer to a local entity's determination that a zone change is consistent with the applicable general plan unless "based on the evidence before [the] City Council, a reasonable person could not have reached the same conclusion. [Citations.]" (*No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223, 243 [242 Cal.Rptr. 37]; see also *Carty* v. *City of Ojai* (1978) 77 Cal.App.3d 329, 333, fn. 1 [143 Cal.Rptr. 506].) Review of local entities' legislative determinations is by ordinary mandamus under Code of Civil Procedure section 1085. Such review is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support. (*Las Virgenes Homeowners Federation, Inc.* v. *County of Los Angeles* (1986) 177 Cal.App.3d 300, 305 [223 Cal.Rptr. 18].)

---

[2]In its statement of decision, the trial court stated, "It does not appear that the subject zone change is inconsistent with respondent City's General Plan. Petitioner attempts to use general policy statements and goals to argue that General Plan 'requirements' were not complied with. Petitioner fails to point to any specific provisions prohibiting the subject zone change, and it cannot be said that the City's determination was arbitrary or capricious."

[3]In its statement of decision, the trial court stated, "With respect to the petitioner's CEQA objections, petitioner correctly points out that the City's determination in the initial study that the project will have no significant impacts upon schools is a mere conclusion not adequately supported by data in the record. (See *Citizens Assoc. etc.* [*sic*] v. *County of Inyo* [1985] 172 Cal.App.3d 151 [217 Cal.Rptr. 893].) However, the court reluctantly finds that petitioner has failed to exhaust its administrative remedies as required by Pub. Res. C. § 21177." The court noted that in its letters, "petitioner did not raise any of the CEQA issues it now raises in this action. Generalized statements of environmental concern are not sufficient. (See *Coalition for Student Action* v. *City of Fullerton* [1984] 153 Cal.App.3d 1194 [200 Cal.Rptr. 855].)"

Legislative enactments are presumed to be valid, and to overcome the presumption of validity, the petitioner must produce evidence "compelling the conclusion that the ordinance is, as a matter of law, unreasonable and invalid. [Citations.] There is also a presumption that the board ascertained the existence of necessary facts to support its action, and that the 'necessary facts' are those required by the applicable standards which guided the board. [Citations.]" (*Orinda Homeowners Committee* v. *Board of Supervisors* (1970) 11 Cal.App.3d 768, 775 [90 Cal.Rptr. 88, 43 A.L.R.3d 880].)

B. *Exhaustion of Administrative Remedies.*

■ The City and DeLeo argue that the District failed to preserve the consistency issue for appeal because the District did not exhaust its administrative remedies before filing the writ petition. (See Gov. Code, § 65009, subd. (b)(1);[4] *Coalition for Student Action* v. *City of Fullerton* (1984) 153 Cal.App.3d 1194, 1197 [200 Cal.Rptr. 855].) Exhaustion of administrative remedies is a jurisdictional prerequisite to judicial action to challenge a planning decision. (*Browning-Ferris Industries* v. *City Council* (1986) 181 Cal.App.3d 852, 859 [226 Cal.Rptr. 575].)

The public notice of the February 20, 1991, hearing which the City caused to be published in the local newspaper did *not* include the warning specified in Government Code section 65009, subdivision (b)(2). Therefore, the City is precluded from objecting to issues raised by the District after the February 20, 1991, public hearing. The exhaustion requirement of Government Code section 65009, subdivision (b)(1) does not apply. (See *Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692, 740-741 [270 Cal.Rptr. 650].)

---

[4]Government Code section 65009, subdivision (b) states, "(1) In an action or proceeding to attack, review, set aside, void or annul a finding, determination, or decision of a public agency made pursuant to this title at a properly noticed public hearing, the issues raised shall be limited to those raised in the public hearing or written correspondence delivered to the public agency prior to, or at, the public hearing, except where the court finds either of the following:

"(A) The issue could not have been raised at the public hearing by persons exercising reasonable diligence.

"(B) The body conducting the public hearing prevented the issue from being raised at the public hearing.

"(2) *If a public agency desires the provisions of this subdivision to apply to a matter, it shall include in any public notice issued pursuant to this title a notice substantially stating all of the following: 'If you challenge the (nature of the proposed action) in court, you may be limited to raising only those issues you or someone else raised at the public hearing described in this notice, or in written correspondence delivered to the (public entity conducting the hearing) at, or prior to, the public hearing.'* " (Italics added.)

## C. Finding of Consistency.

 The District argues that the zone change was inconsistent with the City's General Plan.

The consistency doctrine has been described as "the linchpin of California's land use and development laws; it is the principle which infused the concept of planned growth with the force of law." (*deBottari* v. *City Council* (1985) 171 Cal.App.3d 1204, 1213 [217 Cal.Rptr. 790].) Land-use decisions, including zoning changes, of general law cities must be consistent with the general plan. (Gov. Code, § 65860, subd. (a);[5] *Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531, 536 [277 Cal.Rptr. 1, 802 P.2d 317].)

 The zoning consistency requirement requires local governments to maintain their zoning in a manner consistent with their general plans. Every zoning action must be consistent with the plan, and a zoning ordinance that is inconsistent with the general plan at the time it is enacted is "invalid when passed." (*Sierra Club* v. *Board of Supervisors* (1981) 126 Cal.App.3d 698, 704 [179 Cal.Rptr. 261].)

"An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." (General Plan Guidelines, p. 212, Governor's Office of Planning and Research, 1990.)[6]

 The District cites three recent cases for the proposition that the zone change was inconsistent with the General Plan. (*Murrieta Valley Unified School Dist.* v. *County of Riverside* (1991) 228 Cal.App.3d 1212 [279 Cal.Rptr. 421]; *William S. Hart Union High School Dist.* v. *Regional Planning Com.* (1991) 226 Cal.App.3d 1612 [277 Cal.Rptr. 645]; *Mira Development Corp.* v. *City of San Diego* (1988) 205 Cal.App.3d 1201 [252 Cal.Rptr. 825].)

---

[5]"(a) County or city zoning ordinances shall be consistent with the general plan of the county or city by January 1, 1974. A zoning ordinance shall be consistent with a city or county general plan only if:

"(i) The city or county has officially adopted such a plan, and

"(ii) The various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in such a plan." (Gov. Code, § 65860.)

[6]The General Plan Guidelines are advisory only, but they assist in determining compliance with general plan laws. (*Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 702 [188 Cal.Rptr. 233]; *Bownds* v. *City of Glendale* (1980) 113 Cal.App.3d 875, 886 [170 Cal.Rptr. 342].)

In *Mira*, a developer unsuccessfully sought rezoning from single-family to multiple-family residential. The developer contended the project was consistent with the general plan because it was consistent with the land-use designation in the general plan. The court nonetheless found the city did not abuse its discretion in denying the proposed zoning "on the basis that the proposed multifamily development would outstrip the provision of needed public services and improvements in the area, *a concern included within the community and general plans*." (*Mira Development Corp.* v. *City of San Diego, supra*, 205 Cal.App.3d at pp. 1204-1205, italics added.)

In *Mira*, the applicable community plan provided that development should proceed only if adequate public facilities were assured. Another applicable local policy addressed school overcrowding and requested information from the school district to facilitate development decisions. "The community plan generally proposes to monitor development in relation to the availability of public services, and to that end states building permit issuance should be monitored to prevent premature and uncoordinated development. [¶] More specifically, regarding housing, the community plan states it seeks to develop sufficient housing to accommodate expected increases in population at an appropriate density to avoid overtaxing public facilities. . . . Regarding schools, the community plan proposes to expand school programs to accommodate the needs of all age groups." (*Mira Development Corp.* v. *City of San Diego, supra*, 205 Cal.App.3d at p. 1212.)

*Mira* does not stand for the proposition that a zone change *must* be denied because of an impact on a local school district. Rather, the court decided that on the facts and circumstances before it, the local governing body *did not abuse its discretion* in denying an application for zone change.

In *William S. Hart Union High School Dist.*, the court stated that the limits on school mitigation fees under Government Code sections 65995 and 65996 did not prohibit a local entity from complying with otherwise applicable mandatory standards in its general plan requiring adequate infrastructure. Those standards were set forth in a development monitoring system (DMS) which set forth specific mandatory guidelines which must be followed for the county to approve development projects. (*William S. Hart Union High School Dist.* v. *Regional Planning Com., supra*, 226 Cal.App.3d at p. 1616.) Specifically, the planning commission and board were "required (by the general plan and the DMS) to deny approval of a development project if mitigation measures [were] not sufficient to overcome the adverse impact on school facilities that a proposed development [would] bring." (*Id.*, at p. 1618, italics omitted.) The planning commission had acknowledged in its

DMS reports that the "school classroom supply was not adequate and that there was a potential significant impact on the school district from the proposed development." (*Id.*, at p. 1617.) Here, the General Plan did not contain specific mandatory guidelines similar to those in *William S. Hart Union High School Dist.*

In *Murrieta Valley Unified School Dist.*, the court ruled that when the applicable general plan required a local agency to incorporate nonmonetary school mitigation measures, the requirement of internal consistency required the adoption of such measures in a general plan amendment. The general plan in that case contained a specific public facilities and services element.[7] (*Murrieta Valley Unified School Dist.* v. *County of Riverside, supra*, 228 Cal.App.3d at p. 1235.) Here, the General Plan requires no similar mitigation measures and contains no public facilities and services element.[8]

In summary, the General Plan is not as specific as those in the cases on which the District relies and does not contain mandatory provisions similar to the ones in those cases. Moreover, the District's letters to the City contain only general objections on legal grounds and contain no data or actual evidence of the impact of the zone change on the schools that serve the area of the zone change. The District has failed to carry its burden of showing

---

[7] The public facilities and services element stated, " ' "[W]hen school districts adopt impaction and statements, the County will coordinate with the districts to develop appropriate financing mechanisms for school facilities." ' " In addition, " 'if land use proposals will impact schools, "they must arrange with the school districts to assist in providing adequate school facilities." ' " (*Murrieta Valley Unified School Dist.* v. *County of Riverside, supra*, 228 Cal.App.3d at p. 1235.)

[8] Here, the District contends the zone change was inconsistent with various goals and objectives of the General Plan. The District points out that the land use element of the General Plan includes the following goals and objectives, among others:

"To insure that developing areas are properly served with essential services, utilities and facilities."

"To phase the extension of public services to promote an orderly pattern of development."

"To distribute the cost of new public facilities and services to those generating the needs for additional municipal services."

"To require the master planning of infrastructure systems in major new development areas.

"To provide funding mechanisms which equitably share the costs of infrastructure systems in major new development areas among the beneficiaries of development."

"To insure that major new development areas are self-supporting and will not cause an unacceptable loss of service levels in the developed portions of the City."

With respect to schools, the General Plan states, "The recommended method for coordination is a District Sign-Off or Certification Sheet that will indicate the adequacy of school operating capacity and other public services prior to City Council approval of a final tract map."

The General Plan states, "Public facilities include the civic center area, existing schools and proposed school sites, hospital sites, Corona Municipal Airport and other public service and institution facilities in the Planning Area."

that the City's action was arbitrary, capricious, or entirely lacking in evidentiary support. (*Las Virgenes Homeowners Federation, Inc.* v. *County of Los Angeles, supra,* 177 Cal.App.3d at p. 305.)

## II. *CEQA Challenge*

### A. *Standard of Review.*

Public Resources Code section 21168 provides, "Any action or proceeding to attack, review, set aside, void, or annul a determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure. [¶] In any such action, the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in light of the whole record."

### B. *Exhaustion of Administrative Remedies.*

 The City contends that the District failed to exhaust its administrative remedies, and its CEQA challenge is therefore barred. Parties are required to exhaust their administrative remedies before bringing legal challenges under CEQA. (Pub. Resources Code, § 21177;[9] *Coalition for Student Action* v. *City of Fullerton, supra,* 153 Cal.App.3d 1194, 1198.) ██ The reason for this rule is that the decisionmaking body "is entitled to learn the contentions of interested parties before litigation is instituted. If [plaintiffs] have previously sought administrative relief . . . the Board will have had its opportunity to act and to render litigation unnecessary, if it had chosen to do so.' [Citations.]" (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 162-163 [217 Cal.Rptr. 893].)

In *Coalition for Student Action,* the court stated that raising general environmental criticisms at public hearings was not sufficient to exhaust administrative remedies. The court explained, "It is difficult to imagine any derogatory statement about a land use project which does not implicate the environment somehow." (*Coalition for Student Action* v. *City of Fullerton, supra,* 153 Cal.App.3d at p. 1197.)

 The trial court found that the District had been given actual notice of the preparation of the initial study for the project in August 1990.

---

[9]Public Resources Code section 21177, subdivision (b) states, "No person shall maintain an action unless that person objected to the approval of the project orally or in writing."

However, the District failed to comment or respond then or after the proposed mitigated negative declaration was prepared and circulated for public review and comment. The District also failed to appear at the public meeting on January 22, 1991, at which the planning commission considered the negative declaration.

On appeal, the District contends that under CEQA: (1) the initial study for the project was inadequate; (2) the City's findings were factually erroneous; (3) the findings were not supported by substantial evidence; and (4) the City did not prepare an environmental impact report or adopt a mitigated negative declaration. The District argues that its September 18 and September 26, 1991, letters adequately raised the District's environmental concerns.

Those letters asserted that the District's proposed condition was required for the zone change to be consistent with the General Plan. The letters set forth the provisions of the General Plan on which the District relied and discussed cases supporting the District's position that the City was required to reject any development project that did not comply with the General Plan. The letters also addressed the reasons the permissible development fees were inadequate to meet the District's facility needs.

The District's letters expressed the District's opposition to the zoning change based on inconsistency with the General Plan, but the letters but did not raise any specific challenge to the CEQA procedures or findings. "Mere objections to the *project*, as opposed to the procedure, are not sufficient to alert an agency to an objection based on CEQA." (*Coalition for Student Action* v. *City of Fullerton, supra*, 153 Cal.App.3d at p. 1198.)

We conclude the trial court properly ruled that the District had failed to exhaust its administrative remedies so as to preserve the CEQA challenge.

### DISPOSITION

The judgment is affirmed. Respondents shall recover costs on appeal.

Ramirez, P. J., and McKinster, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 28, 1993. Mosk, J., and Panelli, J., were of the opinion that the petition should be granted.