Filed 2/8/24 (mod.); mod. and part. pub. order 3/7/24 follows unmodified opinion (attached)


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| FIX THE CITY, INC., | B318346 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 18STCP02720) |
| v. | |
| CITY OF LOS ANGELES, | **ORDER MODIFYING OPINION AND DENYING PETITIONS FOR REHEARING** |
| Defendant and Respondent. | |
| | **NO CHANGE IN JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on February 8, 2024, is modified as follows:

On page 34, the last full sentence of the last paragraph, beginning "Fix has not provided . . .", is deleted and replaced with the following sentence:  "Fix has not provided any persuasive legal authority to support their argument that inclusion of a mitigation measure in an environmental impact report makes a policy mandatory in the context of determining general plan consistency."

There is no change in judgment.
The petitions for rehearing are denied.

RUBIN, P. J.        MOOR, J.        KIM, J.

Filed 2/8/24 (unmodified opinion)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| FIX THE CITY, INC., | B318346 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 18STCP02720) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary Strobel, Judge.  Affirmed.

Strumwasser & Woocher, Beverly Grossman Palmer and Caroline C. Chiappetti for Plaintiff and Appellant.

Hydee Feldstein Soto, City Attorney, Terry Kaufmann Macias, Senior Assistant City Attorney, Marvin E. Bonilla, John W. Fox and Kathryn Phelan, Deputy City Attorneys for Defendant and Respondent.

# INTRODUCTION

Appellant Fix the City (Fix) sought a writ of mandate challenging legislative actions taken by the City of Los Angeles (City) to regulate development along a portion of a light rail line running from downtown Los Angeles to Santa Monica. The relevant legislative actions took place at three separate City Council meetings: in early July 2018, the City made amendments to its General Plan and certain community plans; in late July 2018, the City adopted several zoning ordinances and referred a specific plan to the City Attorney for legal review; in November 2019, the City adopted the specific plan. In October 2018, before the specific plan was adopted, Fix's writ petition sought an order directing the City to rescind the specific plan and the implementing ordinances and enjoining the City from implementing the specific plan, on the grounds that the plan and its implementing ordinances were inconsistent with the General Plan.

Well after the statute of limitations for challenging the specific plan had expired, the City successfully obtained judgment on the pleadings on the grounds that Fix's challenge to the specific plan was premature. The trial court gave Fix two opportunities to amend its petition to show timeliness under the relation back doctrine, but ultimately in July 2021, it sustained the City's demurrer to Fix's challenge to the specific plan without leave to amend. The case proceeded with respect to Fix's challenge of the July 2018 zoning ordinances, and in December 2021, the court denied the petition, finding no abuse of discretion in the City's determination that the ordinances were consistent with the City's General Plan. Fix seeks to reverse both the July

2021 order sustaining the City's demurrer without leave to amend and the December 2021 judgment in favor of the City.

On the question of timeliness, Fix contends its challenge to the validity of the City's November 2019 specific plan adoption is timely under the relation back doctrine, because Fix timely challenged the City's July 2018 legislative actions, and the November 2019 adoption of the specific plan was based on the same general set of facts and involved the same injury as the earlier legislative actions. The City responds that the relation back doctrine does not apply, both because Fix's claim does not meet the requirements of the relation back doctrine, and because the statute requiring such challenges to be filed within 90 days of the legislative act is a statute of repose. We conclude that the relation back doctrine does not apply to the two distinct legislative acts—the July 2018 actions and the November 2019 adoption of a specific plan—to render timely the otherwise untimely challenge to the later legislative act.

On the question of plan consistency, Fix contends the City abused its discretion in adopting the July 2018 zoning ordinances because they were inconsistent with certain provisions of the City's General Plan. The City responds that the ordinances do not violate mandatory provisions of the General Plan, and alternatively, there was sufficient evidence to support a finding of consistency. We conclude that Fix has not shown the City's determination of General Plan consistency was an abuse of discretion.

# FACTUAL BACKGROUND

## *The Expo Line Land Use Project*

The Metro Exposition Light Rail Transit Line ("Expo Line") is a 15.2-mile-long transit line running along Exposition Boulevard between downtown Los Angeles and the City of Santa Monica.  The legislative actions at the heart of the current appeal involve approval of component parts of a larger urban planning effort, which we will refer to in this opinion as the Expo Line Land Use Project.  The Expo Line Land Use Project comprises a number of distinct actions taken by the Los Angeles City Council (City Council), including (1) adopting a specific plan entitled Exposition Corridor Transit Neighborhood Plan (the Expo Plan);[1] (2) related zoning changes (the Zoning Ordinances); (3) related amendments to the General Plan/Community Plans (Community Plan Amendments); and (4) a final environmental impact report (the FEIR).

In January 2015, the City released a draft plan for the Expo Plan, along with a draft environmental impact report (DEIR).  As explained in the 2015 draft plan, the goal of the Expo Plan was to "consider how land use regulations can foster building design and a mix of uses around the transit stations that will encourage transit use and improve mobility for everyone."

The legislative actions relevant to this litigation were carried out at three City Council meetings.  On July 3, 2018, the

---

[1] The geographic scope of the Expo Plan generally includes areas within one-half mile of five stations along the Expo Line in the western part of the City.

City Council adopted a resolution to certify the FEIR and adopt the Community Plan Amendments.[2]  On July 31, 2018, the City Council adopted the Zoning Ordinances.  The City Council deferred adoption of the Expo Plan until the City Attorney's Office completed a legal review.  The Zoning Ordinances provided that they would not take effect until the Expo Plan was adopted.  The City Council adopted the Expo Plan more than a year later, on November 5, 2019.

*Litigation*

On October 25, 2018, Fix filed a verified petition for peremptory writ of mandate and complaint for injunctive and declaratory relief (the Initial Petition).  Although the Expo Plan had not yet been adopted, the Initial Petition contained a single cause of action for General Plan inconsistency that purported to challenge the City's adoption of the Expo Plan as inconsistent with the mandatory policies in the General Plan.  The petition referred to the City's actions on July 3, 2018 and July 31, 2018, alleging that the "approvals constituting the Expo Plan and its implementing resolutions became final on August 2, 2018."  In its prayer for relief, the petition sought to rescind the actions purportedly taken in July 2018, including approval of the Expo Plan, any revisions to community plans, and any ordinances implementing the Expo Plan.

A joint case management statement filed in March 2019 acknowledged the Expo Plan had not yet been adopted by the

---

[2] We have not been asked to determine the validity of the Community Plan Amendments.

City.  After the adoption of the Expo Plan in November 2019, two filings referred to the City's action:  (1) the City filed a case management statement and (2) the parties filed a joint stipulation to continue the trial setting conference.  On July 7, 2020, the City certified the administrative record and filed an answer to the Initial Petition.  The City's answer included affirmative defenses based on the timeliness of Fix's challenge to the Expo Plan, including statute of limitations and prematurity.  On prematurity, the City alleged Fix's claims "are barred, in whole or in part, to the extent they purport to challenge actions taken by the City that post-date the filing of the Petition."

In September 2020, the City filed a motion for judgment, arguing that Fix's challenge to the adoption of the Expo Plan was untimely.  The City argued that the Initial Petition could only be construed to have challenged the Zoning Ordinances.  At the time the Initial Petition was filed, the City Council had not yet adopted the Expo Plan, and any challenge to that plan was premature.  More significantly, the City argued that Fix could no longer challenge the adoption of the Expo Plan, as the City Council had adopted that plan on November 5, 2019, and Fix did not timely file an amended or new petition to challenge that legislative action, and the relation back doctrine did not apply.  Fix did not contest that its Initial Petition had been filed prematurely, but rather sought to apply the relation back doctrine to bring a cause of action against the City for its adoption of the Expo Plan in 2019.

The court granted Fix leave to amend to allege facts supporting Fix's view that its challenge related back to the filing date of the Initial Petition.  Fix then filed a First Amended Petition containing three causes of action:  the first challenging

6

the November 2019 Expo Plan, the second challenging the Zoning Ordinances, and the third seeking declaratory relief.  The City demurred to the first cause of action, again asserting it was untimely.  After the trial court sustained the demurrer with leave to amend, in February 2021, Fix filed a second amended petition, the operative pleading.

In July 2021, the court sustained the City's demurrer to the first cause of action in Fix's second amended petition, finding the challenge to the Expo Plan to be untimely, and denying leave to amend.

Following briefing and a hearing on the merits of the remaining two causes of action (Fix's challenge to the Zoning Ordinances and its request for declaratory relief), the trial court took the matter under submission.  On December 17, 2021, the court issued a ruling denying the petition, reasoning that the City Council's adoption of the Zoning Ordinances was not an abuse of discretion, both because the General Plan policies at issue were not mandatory and because there was sufficient evidence in the administrative record to support the City's determination that the Zoning Ordinances were consistent with the General Plan. The court entered judgment on January 21, 2022, and this timely appeal followed.

## DISCUSSION

Fix raises two contentions on appeal.  First, it contends that under the relation back doctrine, its challenge to the November 2019 Expo Plan was timely.  Second, it contends that the City Council's adoption of the Expo Plan and the Zoning

7

Ordinances was an abuse of discretion, because they are inconsistent with the General Plan. We reject both arguments.

### *Fix's Challenge to the Expo Plan is Untimely*

Under Government Code section 65009, subdivision (c)(1)(A)[3], any proceeding to attack a legislative body's decision to adopt a specific plan must be filed and served "within 90 days after the legislative body's decision." After prematurely challenging the November 2019 adoption of the Expo Plan, Fix did not file an amended petition until almost a year later, in October 2020. Fix's October 2020 attack on the Expo Plan can only be considered timely if it "relates back" to the October 2018 Initial Petition. Based on the particular facts of this case, and the purpose behind section 65009's short limitations period, we conclude the relation back doctrine does not apply.

1. <u>Overview of Contentions</u>

Fix contends its otherwise untimely challenge to the 2019 Expo Plan relates back to its Initial Petition, which timely challenged the Zoning Ordinances. Fix argues that all of its claims are based on the same general set of facts about which the City had notice, the same injury, and were caused by the same instrumentality. The City contends the relation back doctrine does not apply, because section 65009 is a statute of repose, relation back would thwart the statutory requirement of

---

[3] All further statutory references are to the Government Code.

8

procedural exhaustion, and Fix's challenge of the Expo Plan does not meet the requirements for relation back.[4]

## 2. Standard of Review

"Where the pertinent facts are undisputed, it is a question of law whether a case is barred by the statute of limitations. Accordingly, we apply the de novo standard of review." (*Arcadia Development Co. v. City of Morgan Hill* (2008) 169 Cal.App.4th 253, 260–261.) A trial court's decision to sustain a demurrer without leave to amend is reviewed de novo. (*Save Lafayette Trees v. City of Lafayette* (2019) 32 Cal.App.5th 148, 154 (*Lafayette*).) "In conducting the review, this court exercises its independent judgment to determine whether the action can proceed under any legal theory. [Citation.] Leave to amend should not be granted if the pleadings disclose the action is barred by a statute of limitations." (*Ibid.*)

## 3. Section 65009

### a. *Operation of the statute of limitations*

Section 65009 imposes a 90-day statute of limitations on legal challenges to specified local planning and zoning decisions, including the adoption of a general or specific plan (*id.*, subd. (c)(1)(A)), and the adoption of a zoning ordinance (*id.*, subd.

---

[4] Because we find the relation back doctrine does not apply, we need not address the City's arguments that section 65009 is a statute of repose, or that the procedural exhaustion requirement prevents application of the relation back doctrine here.

(c)(1)(B)).  (See *Travis v. County of Santa Cruz* (2004) 33 Cal.4th 757, 765 (*Travis*).)  Section 65009, subdivision (c)(1), provides in relevant part that "no action or proceeding shall be maintained . . . unless" it is filed and served "on the legislative body within 90 days after the legislative body's decision" when the action is one:  "(A) To attack" the body's decision "to adopt or amend a general or specific plan" (§ 65009, subd. (c)(1)(A)) or "(B) To attack" the body's decision "to adopt or amend a zoning ordinance" (§ 65009, subd. (c)(1)(B)).  The 90-day limit applies to "both the filing and service of challenges to a broad range of local zoning and planning decisions." (*Honig v. San Francisco Planning Dept.* (2005) 127 Cal.App.4th 520, 526.)

It makes sense that "[t]he limitations periods set out in the statute are triggered by specific acts of local land use planning authorities[,]" (*County of Sonoma v. Superior Court* (2010) 190 Cal.App.4th 1312, 1324):  that is because "[t]he 90-day period is attached to the decision under attack, and to no other decision." (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 388; see *1305 Ingraham, LLC v. City of Los Angeles* (2019) 32 Cal.App.5th 1253, 1261 [discussing requirement of legislative body's decision]; *Urban Habitat Program v. City of Pleasanton* (2008) 164 Cal.App.4th 1561, 1571 (*Urban Habitat*) [the short 90-day period "begins to run from the date the decision is made"]; *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 22 [the statute of limitations on a challenge to the facial validity of a land-use regulation "runs from the date the statute becomes effective"].)[5]

---

[5] With certain exceptions not relevant to our analysis, section 65009, subdivision (b) limits legal actions challenging "a

10

b. *Statutory purpose and construction*

Courts have consistently emphasized section 65009's express purpose of providing certainty to property owners and local governments. (§ 65009, subd. (a).) "The express and manifest intent of section 65009 is to provide local governments with certainty, after a short 90–day period for facial challenges, in the validity of their zoning enactments and decisions." (*Travis, supra*, 33 Cal.4th at p. 774 [rejecting plaintiff's theory of continuous accrual].) The purpose of the short limitations period is "thus to alleviate the 'chilling effect on the confidence with which property owners and local governments can proceed with projects' ([§ 65009], subd. (a)(2)) created by potential legal challenges to local planning and zoning decisions.) (*Id*. at p. 765; *Lafayette, supra*, 32 Cal.App.5th at p. 155 [purpose for the short time frame applicable to both filing and service was "[t]o provide certainty for property owners and local governments regarding decisions by local agencies made pursuant to the planning and zoning law"].) "The legislative policy behind both Government Code section 65009 and CEQA is the prompt resolution of challenges to the decisions of public agencies regarding land use." (*Royalty Carpet Mills, Inc. v. City of Irvine* (2005) 125 Cal.App.4th 1110, 1121 (*Royalty Carpet Mills*).)

---

finding, determination, or decision of a public agency" in the planning and zoning context "at a properly noticed public hearing" to those issues that have been brought to the public agency's attention at or before the public hearing. (§ 65009, subd. (b); *Weiss v. City of Del Mar* (2019) 39 Cal.App.5th 609, 619.)

11

Courts take a restrictive approach to applying section 65009's limitations period, in light of its express acknowledgment of California's housing crisis and its emphasis on reducing delays and restraints on completion of projects without the cloud of potential litigation.  (See, e.g., *Travis, supra*, 33 Cal.4th at pp. 774–775; *Lafayette, supra*, 32 Cal.App.5th at pp. 155–159.)  For example, "[e]ven if a petition is timely filed under Government Code section 65009, subdivision (c), if it is not personally served as required by statute, the petition must be dismissed." (*Royalty Carpet Mills, supra*, 125 Cal.App.4th at p. 1119; see *Wagner v. City of South Pasadena* (2000) 78 Cal.App.4th 943, 950 [writ petition did not meet the statute of limitation because it was served on the 91st day].)  "The Legislature provided that the 90–day period of Government Code section 65009 is an absolute cut-off, beyond which relief for failure to serve a petition cannot be granted." (*Royalty Carpet Mills, supra*, 125 Cal.App.4th at pp. 1114–1115.)

In *Travis,* the Supreme Court considered the applicable limitations period when an ordinance that was initially valid is later preempted by state law.  Any application of the preempted ordinance in a specific instance, such as denial of a conditional use permit, was an adjudicatory decision subject to a 90-day limitations period under section 65009, subdivision (c)(1)(E). (*Travis*, *supra*, 33 Cal.4th at pp. 766–769.)  Because a facial challenge would not be to an agency's decision to *adopt* a zoning ordinance, but rather its failure to repeal an ordinance that had been rendered invalid by state law, a three-year limitations period under Code of Civil Procedure section 338 applied, running from the preemptive state law's effective date.  (*Id.* at pp. 771–773.)  Because the three-year deadline from the effective

12

date of the preempted ordinance at issue in *Travis* had already passed, plaintiffs argued for a "continuous accrual" approach, under which the three-year period would begin when a specific conditional use permit was denied or the preempted statute was applied in some way, rather than when the preemptive state law took effect. (*Id*. at p. 774.) The court rejected that approach, reasoning it would "thwart the legislative purpose behind section 65009 without any necessity in justice or fairness." (*Ibid*.) Plaintiff's continuous accrual approach would create an "illogical contrast," based solely on whether the ordinance was invalid at the time of enactment or was later preempted. Ordinances that were invalid at the time of adoption have a 90-day limitations period under section 65009, subdivision (c)(1)(B). Permitting a facial challenge to a preempted ordinance to be brought at any time within three years of the ordinance's application—in contrast to the date the ordinance was preempted—would "directly contravene" the "legislative policy of requiring a prompt challenge, running from the earliest date the action could be brought." (*Id*. at p. 775.)

4. Relation Back Doctrine

"Where the statute of limitations has expired before the filing of an amended complaint, unless an amended complaint relates back to a timely filed original complaint, the amended complaint will be time-barred. (*Barrington v. A.H. Robins Co.* (1985) 39 Cal.3d 146, 150.) Under the relation back doctrine, to avoid the statute of limitations bar, the amended complaint must allege the same general set of facts, refer to the same accident, same injuries, and refer to the same instrumentality as alleged in

13

the original complaint.  (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 408–409.)"  (*Curtis Engineering Corp. v. Superior Court* (2017) 16 Cal.App.5th 542, 548; see also *Engel v. Pech* (2023) 95 Cal.App.5th 1227, 1236 [relation back doctrine applies to late-filed claims if they "(1) rest on the *same general set of facts*, (2) involve the *same injury*, and (3) refer to the *same instrumentality*, as the original [pleading]"].)

"The relation-back doctrine . . . requires courts to compare the factual allegations in the original and amended complaints. For example, a third amended complaint alleging a cause of action for age discrimination . . . did not relate back to the filing of the original complaint because the wrongful conduct described in the discrimination claim did not arise out of the same set of facts alleged in the original complaint to support claims of breach of contract and Labor Code violations.  [Citation.]  And an amended complaint alleging the decedent was electrocuted by a lamp socket and switch manufactured by one entity did not relate back to an original complaint alleging the electrocution was caused by a defective hair dryer with a different manufacturer because, although the pleadings related to a single death at a single location, they alleged different accidents and instrumentalities.  [Citation.]"  (*Davaloo v. State Farm Ins. Co.* (2005) 135 Cal.App.4th 409, 416; see also *Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 230–231 [denial of leave to amend was not error, because proposed amendment to add new cause of action for negligent advice was untimely and did not relate back to original complaint for legal malpractice].)

5. <u>Analysis</u>

Fix goes to great lengths to explain how the 2018 Zoning Ordinances and the 2019 Expo Plan were closely interrelated. We do not disagree with this characterization, and we note the Zoning Ordinances expressly provided they would not become effective until adoption of the Expo Plan. Although Fix concedes that its second amended petition "refers to a second legislative act, the City's 2019 approval of the ordinance making the Expo Plan, as approved in 2018, effective," Fix argues that we should afford no real significance to the distinct legislative actions, their timing, and their import in the context of section 65009. We disagree. As explained below, considering the statutory language and legislative purpose of section 65009, and in light of the relevant authorities, we conclude that Fix's untimely challenge to the City's 2019 Expo Plan does not relate back to the timely challenge of the 2018 Zoning Ordinances. The City's legislative actions in July 2018 and November 2019 are distinct instrumentalities, and the challenge to each legislative action was subject to its own statute of limitations.

### a. *Relation back to premature actions*

In addressing whether the relation back doctrine applies, Fix underplays the significance of the City's formal adoption of the Expo Plan in November 2019, and emphasizes that the planning and execution of the Expo Line Land Use Project unfolded over several years. But Fix cannot escape the fact that the formal decision to adopt the Expo Plan is the most significant

15

conduct at issue in this litigation, and that Fix's cause of action did not accrue under section 65009 until the City Council adopted the Expo Plan in November 2019.

It is well-settled in California law "that causes of action do not accrue until *after* defendants have committed the wrongful act which gives rise to the cause of action in the first place." (*Lee v. Bank of America* (1994) 27 Cal.App.4th 197, 205 (*Lee*), fn. omitted, italics added.) In the context of this case, where Fix's second amended petition alleges one cause of action to attack the City Council's decision to adopt the Expo Plan, and a second cause of action to attack the City Council's decision to adopt the Zoning Ordinances, the wrongful acts at issue are legislative actions that took place more than a year apart. Fix effectively concedes in this appeal, as it did in the proceedings below relating to the City's motion for judgment on the Initial Petition, that its Initial Petition was premature to the extent it purported to attack the Expo Plan, as no cause of action had yet accrued when Fix initially filed this action. The fact that Fix now seeks to relate back its cause of action attacking the 2019 Expo Plan to a date on which that cause of action did not yet exist undermines application of the relation back doctrine.

In *Lee*, the court analyzed whether the relation back doctrine could save untimely added claims using the date of an initial pleading, where that initial pleading preceded accrual of the added claims. Plaintiff was a bank employee who sued her employer after being demoted with a salary reduction. (*Ibid.*) Although her original complaint denominated her claim as "wrongful termination," the factual allegations pertained to the circumstances of her demotion and was filed while she was still an employee. The bank fired her a month *after* her lawsuit was

16

filed, and she did not file her first amended complaint until more than two years later, so the wrongful termination claim would only be timely if her amended complaint related back to the original complaint. (*Id*. at p. 202.) The *Lee* court explained that "different acts allegedly leading to the same injuries are not part of the same general set of facts even though the two different acts may, in context, have been part of the same 'story.' " (*Lee*, at p. 208.) The acts forming the basis for plaintiff's untimely termination claim were distinct from those supporting the timely claim brought after she was demoted. Because plaintiff's termination was a distinct wrongful act occurring after she had filed suit, the later-filed complaint did not relate back to the original one. (*Lee*, at pp. 212–214.)[6]

Fix does not effectively counter the fundamental reasoning in *Lee*: that application of the relation back doctrine to a date prior to the conduct that is the essential conduct for a cause of action to accrue makes little sense.[7] We find that this reasoning

---

[6] When a cause of action is "based on facts arising after the original complaint was filed," such cases "should be distinguished from lawsuits which are premature because of some procedural matter that did not come into existence until after the complaint was originally filed." (*Lee*, at p. 206.)

[7] We are aware that there is contrary authority: the court in *Lee* discussed and disagreed with *Honig v. Financial Corp. of America* (1992) 6 Cal.App.4th 960, which on very similar facts reasoned that a wrongful termination claim arising after the initial complaint was filed could be added by an amended complaint, and the relation back doctrine would apply because the facts in the original and amended complaints "related to the

is particularly significant in the context of section 65009, because it is a statute of limitations with the express purpose of providing certainty and finality to local government land use decisions. (§ 65009, subd. (a).)  Creating a situation where a local government's legislative process can be disrupted by premature filings, which are then used to assert later, untimely challenges to the local government's ultimate land use decisions, is contrary to the purposes of section 65009.

### b. *Relation back and continuing harms*

Rather than directly confronting the problem of permitting relation back of a cause of action to a date before that cause of action had even accrued, Fix invites us to focus on whether the defendant was on notice of the potential claims from the initial pleading.  Fix essentially contends that the requirements of the relation back doctrine are satisfied so long as the City could anticipate the substance of the later amended petition.

In support of the notice argument, Fix relies heavily on *Bendix Corp. v. City of Los Angeles* (1984) 150 Cal.App.3d 921.  In *Bendix*, the court permitted the plaintiff to seek a refund of overpaid taxes for tax years 1976 and 1977, even though no

---

same general set of facts," and "were in the chain of events originally pled." (*Honig*, at pp. 966–967.)  The *Honig* court found the amendments permissible because they "finished telling the story begun in the original complaint," the parties were fully aware of the later events, and there was no prejudice. (*Id.* at p. 966.)  However, we agree with the court in *Lee* that the *Honig* court reached its conclusion without persuasively addressing the problem of a distinct wrongful act. (*Lee, supra*, 27 Cal.App.4th at p. 212.)

18

timely claim was filed for those years; the court permitted relation back to an original proceeding that sought refunds for tax years 1961 through 1975. The court emphasized that where the conduct alleged in the original pleading gave notice of alleged wrongful conduct that was of a continuing nature, relation back should be permitted. The *Bendix* court addressed the timeliness question by examining the nature of the newly asserted, untimely claims: " 'If those claims are unrelated to those alleged in the initial complaint, or rely on conduct or events different from those involved in the original action, the statute of limitations should be applied. [Citations.] Where, however, the original pleading gave notice that the alleged wrongful conduct was of a continuing nature, supplemental pleadings addressed to the same conduct should not encounter statute of limitations questions.' " (*Bendix, supra*, 150 Cal.App.3d at p. 926, quoting *William Inglis, etc. v. ITT Continental Baking Co.* (9th Cir. 1981) 668 F.2d 1014, 1057.) The court determined that the subsequent tax years could be added: "[t]he supplemental complaint merely restated the allegations of the initial pleadings and further alleged only that the claimed violations had continued. Of course, the complaint was based on new events, but these events are a continuation of the old cause of action. [Citation.]" (*Bendix,* at p. 926.) The *Bendix* court reasoned that allowing the later, untimely claims to relate back to the original complaint was preferable, because it "promotes the purpose of the statute of limitations and fosters the policy that cases should be determined on their merits." (*Id.* at p. 925, fn. omitted.)

However, the appellate court deciding *ITT Gilfillan, Inc. v. City of Los Angeles* (1982) 136 Cal.App.3d 581, 586 took a different view and denied application of the relation back

doctrine in similar circumstances. In *ITT Gilfillian*, the reviewing court emphasized the difference between an amended complaint—involving "the same general facts as the original complaint"—and a supplemental complaint, which "deals with matters occurring *after* commencement of the action." (136 Cal.App.3d at p. 586.) While a new cause of action asserted in an *amended* complaint could relate back to the original, a new cause of action in a *supplemental* complaint could not, because the new claim could be asserted in a separate complaint. (*Id*. at pp. 588–589.)

Fix's analysis of, and reliance on, *Bendix* fails to grapple with an essential reason the court permitted relation back: it found the alleged wrongful conduct was of a continuing nature. To the extent *Bendix* suggests that where an initial pleading fairly alleges a continuing violation, subsequent conduct falling within that continuing violation can be related back to the original pleading, we are not persuaded that the causes of action here comprise continuing violations. Section 65009 in its purpose and operation separates out each decision of a legislative body on specified land use determinations as a distinct cause of action subject to its own 90-day statute of limitations. (See § 65009, subd. (c)(1)(A) through (E); *Travis, supra*, 33 Cal.4th at pp. 765–766.) Indeed, in *Travis*, our Supreme Court rejected a theory of continuous accrual as antithetical to the purpose of section 65009. (*Travis, supra*, 33 Cal.4th at p. 774.) The concept of continuing wrongful conduct, as used in *Bendix*, is inapt because it ignores the fact that each 90-day statutory period under section 65009 is triggered by a separate legislative action.

20

### c. *Instrumentality*

Fix relies heavily on *Pointe San Diego Residential Community, L.P. v. Procopio, Cory, Hargreaves & Savitch, LLP* (2011) 195 Cal.App.4th 265 (*Pointe*), where the reviewing court found the relation back doctrine applicable because plaintiffs' various alleged acts of legal malpractice all "referred to the same instrumentality (alleged professional negligence)" in the course of the same litigation. (*Id.* at p. 278.) Fix describes the instrumentality here at a similar level of abstraction: "the Expo Plan's conflict with the General Plan requirements regarding infrastructure adequacy."

In *Pointe*, plaintiffs filed suit against a defendant law firm within one year after discharging the firm from a separate, ongoing litigation matter. The plaintiffs' initial form complaint alleged general negligence, with bare bones factual allegations that the law firm had failed to use due care in representing plaintiffs in the identified litigation. (*Id.* at p. 277.) Plaintiffs filed their fourth amended complaint more than four years later, alleging nine distinct causes of action, and giving details about the dates plaintiffs sustained injuries from each alleged act of malpractice and facts pertaining to the relation back issue. (*Id.* at pp. 272–273.) Each act of malpractice preceded the filing of the initial complaint. (*Id.* at p. 271.) The court reasoned that the initial complaint was sufficient to put the law firm on notice of the nature of the malpractice claim, including the need to gather and preserve evidence relating to the underlying litigation, and "it would defeat this state's liberal pleading rules and statutory and judicial policies requiring prompt filing of malpractice complaints to hold the relation-back doctrine inapplicable here

21

merely because plaintiffs' original complaint did not contain detailed allegations of the precise nature of the alleged legal malpractice." (*Id.* at p. 279.)

Fix argues that just as the *Pointe* court reasoned that the plaintiffs' malpractice claims sprung from a single "primary right—the right to be free of negligence by their attorneys in connection with the litigation for which they were retained," (*id.* at pp. 274–275), the two causes of action in Fix's second amended petition, the first cause of action challenging the 2019 Expo Plan adoption and the second cause of action challenging the Zoning Ordinances, also pertain to the same primary right—the right to City land use decisions consistent with the General Plan.

We disagree that *Pointe* is instructive here as to the nature of the instrumentalities. In *Pointe*, the initial pleading was vague, asserting a single cause of action for malpractice without detailing specific acts encompassed within that allegation. The later filed causes of action simply identified the various acts of malpractice and, significantly, each one of those acts had already occurred at the time the original complaint was filed. Although each individual action could be considered a separate cause of harm, the *Pointe* court sensibly viewed attorney malpractice as a single instrumentality.

We view the instant case as closer to the circumstances in *McCauley v. Howard Jarvis Taxpayers Assn.* (1998) 68 Cal.App.4th 1255, relied upon by the City. In *McCauley*, the court concluded that an amended complaint asserting an otherwise untimely challenge to one instance of the defendant's political financial reporting did not relate back to the original complaint. The original 1988 complaint alleged defendant violated reporting requirements in connection with a 1984 ballot

22

initiative.  Plaintiff filed an amended complaint in 1991 adding more violations, including a violation relating to the 1986 election.  (*Id*. at pp. 1258–1259.)  The claim based on the 1986 violation would only be timely if it related back to the 1988 original complaint.  (*Id*. at p. 1261.)  The reviewing court rejected as "absurdly broad" plaintiff's argument that the two violations, pertaining to two different sets of direct mail in two different elections, related to the " 'same general set of facts.' "  (*Id*. at pp. 1261–1262.)  Plaintiff had also argued that because the discrete violations were part of the defendant's " 'ongoing' duty to file campaign reports," the original complaint alleging violation of that duty was sufficient to anchor other violations as well.  (*Id*. at p. 1262.)  The court rejected this argument, noting that "to hold that separate reporting violations could be part of one blurred 'ongoing duty' to file reports flies in the face of . . . ." the statutory scheme, which required private litigants to first give the civil prosecutor an opportunity to pursue the claim before filing suit.  (*Id*. at p. 1263.)  The *McCauley* court cited with approval the analysis in *Lee* and its rejection of the relation back doctrine, particularly to circumstances where "[o]ne could even be sued for acts one has yet to do."  (*Id*. at p. 1262.)

Here, Fix's untimely effort to challenge actions that post-dated the Initial Petition through the relation back doctrine is not comparable to the facts in *Pointe, supra*, 195 Cal.App.4th 265, where the later amendments to the complaint simply filled in to a broadly pleaded initial complaint the specific instances of malpractice that existed at the time the initial complaint was filed.  Rather, as in *Lee*, Fix is challenging conduct that did not exist at the time of the Initial Petition, and that is distinct from the conduct that caused a different cause of action to accrue later.

Similar to the distinct wrongs at issue in both *Lee* and *McCauley*, each of the two legislative acts at issue are not violations of any ongoing duty; under the operation of section 65009, they are distinct land use decisions that are independently actionable. As such, the relation back doctrine does not apply.

We are also unconvinced by Fix's argument that because an allegation of General Plan inconsistency forms the basis for Fix's attacks against both the 2018 Zoning Ordinances and the 2019 Expo Plan, the two claims arise from the same primary right, and therefore satisfy the "same injury" requirement for relation back.[8]

### d. Policy considerations

We remain cognizant of the case law favoring liberal application of the relation back doctrine to support the state's strong policy of deciding cases on their merits when a defendant has adequate notice of a claim. (*Estrada v. Royalty Carpet Mills, Inc.* (2022) 76 Cal.App.5th 685, 715.) However, in the particular circumstances of this case, those concerns are outweighed by the need to provide certainty to property owners and local governments through finality in land use decisions, express legislative purposes of section 65009's short limitations period. Fix counters that the City Council's actions led to confusion about when legislative acts took place. However, the City filed a joint case management statement on November 18, 2019 advising the

---

[8] We are not persuaded by Fix's reliance on *Atwell v. City of Rohnert Park* (2018) 27 Cal.App.5th 692, which Fix acknowledges did not involve either the relation back doctrine or the statute of limitations under section 65009.

24

court that the City Council had adopted the Expo Plan on November 5, 2019.  Had Fix filed a supplemental complaint within 90 days after that legislative act, there would be no question about the timeliness of its challenge.  It did not do so, and instead it belatedly sought to convince first the trial court and now this court that its untimely claim should relate back to the 2018 petition.

Because this case involves two distinct legislative acts governed by section 65009's 90-day statute of limitations, and Fix failed to timely challenge the second legislative act, we conclude that the relation back doctrine does not apply.

### *The City's Finding of General Plan Consistency Was Not an Abuse of Discretion*

In its second amended petition and its appellate briefing, Fix tries mightily to shift the lens through which it seeks to examine the City's action, heavily relying on statements made by the City in other contexts, such as in separate litigation or the Framework Element draft environmental impact report.  But this case is not about whether the City's infrastructure is already broken or stretched too thin, or even whether the increases in population density associated with the Zoning Ordinances at issue here will further strain the existing City infrastructure.

Instead, in determining whether the Zoning Ordinances are inconsistent with the General Plan, the only question the trial court needed to examine, and the only issue we are examining here, is whether the General Plan imposes on the City a clear, mandatory duty to disallow new development until adequate infrastructure is in place.  We conclude that the General Plan

does not impose a mandatory duty to disallow any new development, but rather to make an express or implied finding of infrastructure adequacy. Considered in context, there is substantial evidence to support an implied finding that the changes enacted through the Zoning Ordinances are supported by adequate infrastructure because the overall goal is to encourage more density and mixed uses of property near transportation infrastructure, namely the new light rail stations.

1. Overview of Contentions

Fix contends the General Plan imposes on the City a mandatory obligation to ensure the adequacy of public infrastructure and emergency services prior to approving increases in density. It argues the Zoning Ordinances are invalid because they are inconsistent with General Plan policies, specifically the Framework Element Policy 3.3.2 and West Los Angeles Community Plan Policies 1-2.3 and 16-2.1. The City contends the Zoning Ordinances are compatible with the General Plan and the identified policies are not mandatory. It alternatively argues that if the policies are mandatory, the record evidence supports a finding of infrastructure adequacy.

2. Overview of the City's General Plan and Land Use Planning Process

The City's General Plan comprises a number of distinct elements, including 8 elements required under state law, as well as 35 different community plans. The process for approving zoning ordinances is described in various provisions of the City

26

Charter, the Los Angeles Administrative Code, and the Rules of the Los Angeles City Council. As relevant here, when the City Council adopts a zoning ordinance, it must find the ordinance to be "in substantial conformance with the purposes, intent and provisions of the General Plan." (Los Angeles Charter and Administrative Code, § 558; see also Los Angeles Muni. Code, §12.32.)

### 3. General Plan and Consistency Requirements

"A city or county must adopt a 'comprehensive, long-term general plan' for its physical development. (Gov. Code, § 65300.) The general plan must include 'a statement of development policies and . . . objectives, principles, standards, and plan proposals' and elements addressing land use, circulation, housing, conservation, open space, noise, and safety. (Gov. Code, § 65302.)" (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1194 (*Federation*).) "The general plan has been aptly described as the 'constitution for all future developments' within the city or county." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570.) "The general plan serves as a 'charter for future development' [citation] embodying fundamental policy decisions [citation]. The policies in a general plan typically reflect a range of competing interests. [Citation.]" (*Federation, supra*, 126 Cal.App.4th at p. 1194.)

Any legislative action or adjudicatory decision by city or county government affecting land use must be consistent with the governing general plan. (*City of Morgan Hill v. Bushey* (2018) 5 Cal.5th 1068, 1079; *Friends of Lagoon Valley v. City of Vacaville*

27

(2007) 154 Cal.App.4th 807, 815 (*Lagoon Valley*).) "However, ' "it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. . . . It is enough that the proposed project will be compatible with the objectives, policies, general land uses and programs specified in the applicable plan." ' " (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 498–499.) "A project is consistent with the general plan ' "if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." ' " (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336 (*FUTURE*).) A project is inconsistent with the general plan if it conflicts with a policy that is "fundamental, mandatory, and clear." (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782.)

4. Standard of Review

" '[A] governing body's conclusion that a particular project is consistent with the relevant general plan carries a strong presumption of regularity that can be overcome only by a showing of abuse of discretion.' [Citations.] 'An abuse of discretion is established only if the city council has not proceeded in a manner required by law, its decision is not supported by findings, or the findings are not supported by substantial evidence. [Citation.] We may neither substitute our view for that of the city council, nor reweigh conflicting evidence presented to that body. [Citation.]' [Citation.] This review is highly deferential to the local agency, 'recognizing that "the body

28

which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' [Citation.]" [Citation.]' [Citation.] Because an appellate court's task in review of a mandate proceeding is essentially the same as that of the trial court, we review the agency's actions directly and are not bound by the trial court's conclusions. [Citations.]" (*Lagoon Valley, supra*, 154 Cal.App.4th at pp. 816–817.)

"The enactment of a zoning ordinance is a quasi-legislative decision. [Citations.] Courts defer to a local entity's determination that a zone change is consistent with the applicable general plan unless 'based on the evidence before [the] City Council, a reasonable person could not have reached the same conclusion. [Citations.]' " (*Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 992 (*Corona*); see also *FUTURE, supra*, 62 Cal.App.4th at p. 1338 [general plan consistency determination reversed only if no reasonable person would reach the same conclusion].)

The same deferential standard applies when a city makes an adjudicatory decision, such as approving a specific development project. "Where a consistency determination involves the application of a general plan's established land use designation to a particular development, it is fundamentally

29

adjudicatory. In such circumstances, a consistency determination is entitled to deference as an extension of a planning agency's ' "unique competence to interpret [its] policies when applying them in its adjudicatory capacity." ' [Citation.] Reviewing courts must defer to a procedurally proper consistency finding unless no reasonable person could have reached the same conclusion." (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 155.)

"Legislative enactments are presumed to be valid, and to overcome the presumption of validity, the petitioner must produce evidence 'compelling the conclusion that the ordinance is, as a matter of law, unreasonable and invalid. [Citations.] There is also a presumption that the board ascertained the existence of necessary facts to support its action, and that the "necessary facts" are those required by the applicable standards which guided the board. [Citations.]' [Citation.]" (*Corona, supra*, 17 Cal.App.4th at p. 993.)

5. <u>Analysis</u>

We agree with the trial court that Fix did not meet its burden to show that the Zoning Ordinances were inconsistent with the City's General Plan.[9] The language Fix relies upon is too amorphous to establish a fundamental and specific inconsistency with a mandatory requirement, particularly when

_____

[9] During appellate briefing, Fix and the City filed separate requests for judicial notice, asking this court to take judicial notice of various documents, some of which were before the trial court and some of which were not. We grant Fix's request and note that the City's request was granted on February 3, 2023.

30

the language at issue is considered in the greater context of the competing policies and priorities that are included in the scope of the General Plan as a whole, as well as the Framework Element and the West Los Angeles Community Plan.  (See *San Francisco Tomorrow v. City of San Francisco* (2014) 229 Cal.App.4th 498, 517 (*San Francisco Tomorrow*) [rejecting argument that policies were fundamental, mandatory and clear and that board could not weigh and balance multiple policies].)  We are also not persuaded by Fix's argument that statements by the City in other contexts, including litigation over the Framework Element, transform permissive language in the General Plan into mandatory requirements for purposes of determining the consistency of later-enacted ordinances.

### a.  General plan, framework element policy 3.3.2

Fix contends that under the Framework Element, the City would not just measure the adequacy of City services and infrastructure, but also "only approve increases in density when infrastructure and services were adequate and not threatened."  The plain language of Policy 3.3.2 of the Framework Element[10]

---

[10] The full text of Policy 3.3.2 states:  "Monitor population, development, and infrastructure and service capacities within the City and each community plan area, or other pertinent service area.  The results of this monitoring effort will be annually reported to the City Council and shall be used in part as a basis to:  [¶]  a. Determine the need and establish programs for infrastructure and public service investments to accommodate development in areas in which economic development is desired and for which growth is focused by the General Plan Framework

31

does not support Fix's argument that the General Plan imposes on the City a clear and mandatory duty to ensure adequate infrastructure before increasing density. (*San Francisco Tomorrow, supra*, 229 Cal.App.4th at p. 517, quoting *FUTURE*, at p. 1341 [it is critical to consider the nature of the policy and the purported inconsistency].) Instead, the policy directs the City to "monitor population, development, and infrastructure and services capacities" within the City as a whole and within each community plan area, and to report the results of the monitoring effort to the City Council. The report then "shall be used . . . as a

Element. [¶] b. Change or increase the development forecast within the City and/or community plan area as specified in Table 2-2 (see Chapter 2: *Growth and Capacity*) when it can be demonstrated that (1) transportation improvements have been implemented or funded that increase capacity and maintain the level of service, (2) demand management or behavioral changes have reduced traffic volumes and maintained or improved levels of service, and (3) the community character will not be significantly impacted by such increases. [¶] Such modifications shall be considered as amendments to Table 2-2 and depicted on the community plans. [¶] c. Initiate a study to consider whether additional growth should be accommodated, when 75 percent of the forecast of any one or more category listed in Table 2-2 (see Chapter 2: *Growth and Capacity*) is attained within a community plan area. If a study is necessary, determine the level of growth that should be accommodated and correlate that level with the capital, facility, or service improvements and/or transportation demand reduction programs that are necessary to accommodate that level. [¶] d. Consider regulating the type, location, and/or timing of development, when all of the preceding steps have been completed, additional infrastructure and services have been provided, and there remains inadequate public infrastructure or service to support land use development."

32

basis to" do four things: (1) measure need and establish programs for infrastructure and public service investments in specified areas; (2) modify the City's forecasts for growth and capacity; (3) if certain conditions are met, initiate a study to consider whether additional growth should be accommodated, and correlate the level of growth with "the capital, facility, or service improvements and/or transportation demand reduction programs that are necessary to accommodate that level[;]" and (4) "[c]onsider regulating the type, location, and/or timing of development, when all of the preceding steps have been completed, additional infrastructure and services have been provided, and there remains inadequate public infrastructure or service to support land use development."

We agree that the language of Policy 3.3.2 requires the City to monitor the "infrastructure and service capacities" of the 35 community areas within the City, and to study and consider how resources can be devoted to improving infrastructure where needed. However, the Policy does not prohibit the City from increasing density or approving development, even in circumstances where "there remains inadequate public infrastructure or service to support land use development." In such circumstances, far from *prohibiting* development when infrastructure is inadequate, the policy simply requires the City to *consider* regulating development. (Policy 3.3.2(d) ["Consider regulating the type, location, and/or timing of development"].) In other words, the policy does *not* expressly prohibit development based solely on inadequate infrastructure, and therefore does not prohibit the City from increasing density even in circumstances where the existing infrastructure is inadequate.

Our conclusion is reinforced by language in Chapter 10 of the Framework Element, discussing Implementation Programs. After noting that "not all plan policies can be achieved in any given action, and in relation to any decision, some goals may be more compelling than others," and noting that the chapter includes over 60 implementation programs, the introduction provides a bullet point summary of "the principal programs that are essential in carrying out the policy direction of the Framework Element." The two bullet points relevant to our analysis focus not on prohibiting development, but monitoring the ongoing balance between development and providing public services, while also protecting the environment: "A program to monitor the status of development activity, capabilities of infrastructure and public services to provide adequate levels of service, and environmental impacts (e.g., air emissions), identifying critical constraints. deficiencies and planned improvements (where appropriate) (P42)" and "An Annual Report on Growth and Infrastructure that documents the results of the annual monitoring program (P43)."

Finally, we are unpersuaded by Fix's argument that Policy 3.3.2 imposes a mandatory duty because it was part of a plan to mitigate the development impacts of the Framework Element. Fix has not provided any legal authority to support their argument that mere inclusion in an environmental impact report makes a policy mandatory.

b. *West Los Angeles Community Plan, Policies 1-2.3 and 16-2.1*

Turning to the West Los Angeles Community Plan, while the language Fix relies on is more targeted than the language in the Framework Element, it is not mandatory, and it lacks the clarity and specificity necessary to overcome the presumption that the Zoning Ordinances are valid and consistent with the General Plan.

The West Los Angeles Community Plan embodies a wide range of policies, and neither Policy 1-2.3 nor Policy 16-2.1 are specific enough to support a finding of general plan inconsistency. Policy 1-2.3 states, "Do not increase residential densities beyond those permitted in the Plan unless the necessary infrastructure and transportation systems are available to accommodate the increase." The associated program note states: "[t]he decision maker should adopt a finding which addresses the availability and adequacy of infrastructure as part of any decision relating to an increase in permitted residential density." We agree with the City that the use of the word "should" rather than "shall" or "must," weighs against construing the policy (and its suggestion that the decisionmaker adopt a finding) as mandatory. (*Kucera v. Lizza* (1997) 59 Cal.App.4th 1141, 1152 [" 'may' and 'should' are ordinarily permissive].) Neither the policy's reference to "necessary infrastructure and transportation systems" nor the program note's reference to "availability and adequacy of infrastructure" provides any specific details about what is meant by the term "infrastructure," or how to determine whether it is necessary, available, or adequate. In addition, Policy 1-2.3 is the third of three policies under the plan's Objective 1-2: "To reduce

35

vehicular trips and congestion by developing new housing in proximity to adequate services and facilities." The other two policies also prioritize proximity of development to public transportation.[11] Considered in context, it would be reasonable to infer that the focus of Policy 1-2.3 is on transportation infrastructure generally. Instead, Fix takes a narrow view focused on emergency response times. Even if the Policy can be understood to be referring to infrastructure generally, the lack of any express method to measure infrastructure adequacy in the context of the policy undermines Fix's argument that the Zoning Ordinances are invalid because they are inconsistent with this policy. (See *Lagoon Valley, supra*, 154 Cal.App.4th at pp. 820–821 [rejecting project opponent's characterization of a traffic circulation policy as a "rigid mandate," and instead concluding "the policies actually afford the City a high degree of flexibility in balancing traffic circulation and land use considerations"].)

Policy 16-2.1 states "No increase in density shall be effected by zone change, plan amendment, subdivision or other discretionary action, unless it is determined that the transportation infrastructure serving the property can accommodate the traffic generated." It is the only policy under Objective 16- 2: "To ensure that the location, intensity and timing of development is consistent with the provision of adequate transportation infrastructure." The program note

---

[11] Policy 1-2.1 states: "Locate higher residential densities near commercial centers and major bus routes where public service facilities and infrastructure will support this development." Policy 1-2.2 states: "Locate senior citizen housing within reasonable walking distance of health and community facilities, services and public transportation."

states:  "Decision makers shall adopt a finding with regards to infrastructure adequacy as part of their action on discretionary approvals resulting in increased density or intensity."  Given that the plain language of Objective 16-2 focuses on "transportation infrastructure," and the entire Expo Plan Project is premised on the expansion of a light rail system, applying the presumption that the City ascertained the existence of necessary facts to support its action (*Corona, supra*, 17 Cal.App.4th at p. 993), we conclude that the City implicitly determined that increased access to public transportation warranted the increases in density near the Expo Line stations.

Fix argues that the trial court improperly relied on an unpublished case, *Saunders v. City of Los Angeles*, 2012 Cal.App. Unpub. LEXIS 6965, in concluding that the use of the word "shall" in Policy 16-2.1 does not necessarily create a mandatory duty.  Because we independently conclude that none of the policies Fix relies upon establish a clear, mandatory duty sufficient to undermine the City's plan consistency determination, there is no need for us to determine whether the trial court's references to *Saunders* violated rule 8.1115 of the California Rules of Court.

Both cases Fix relies on, *FUTURE* and *Endangered Habitats*, involved specific, unambiguous mandatory policies.  In *FUTURE*, the general plan's land use policy limited which areas could be designated as "low density residential" to land contiguous to "Community Regions" and "Rural Centers," preventing the use of the "low density residential" designation for land that did not meet the description.  (*FUTURE, supra*, 62 Cal.App.4th at p. 1339.)  The court found invalid the county's approval of a low-density residential project on land that was not

37

contiguous to a "Community Region" or "Rural Center," because it was inconsistent with a "fundamental, mandatory and specific land use policy." (*FUTURE*, at p. 1342.)  In *Endangered Habitats*, the court found no reasonable person could conclude the project in question was consistent with the general plan, where it violated a " 'traffic level of service policy' " using the methodology identified by the policy; the Board had not used the policy's express methodology, but instead employed a different methodology, not sanctioned in the policy, to find that the project had an acceptable impact.  (*Endangered Habitats*, *supra*, 131 Cal.App.4th at pp. 782–783.)  The court also invalidated proposed amendments to a specific plan where the general plan required all new development to comply with *all* specific plan policies, while the proposed amendments (which the reviewing court invalidated as inconsistent with the general plan) would allow a balancing approach to specific plan requirements and exempt the project in question from certain specific plan requirements.  (*Id.* at pp. 785–790.)

In contrast, both Policy 1-2.3 and 16.2-1 lack the clarity or specificity necessary to conclude that the City abused its discretion when it determined—expressly or implicitly—that the Zoning Ordinances were consistent with the General Plan.  (See *Corona, supra*, 17 Cal.App.4th at p. 993 [presumption that the board ascertained the facts necessary to support its decision].)  Fix's argument is closer to the ones rejected in *Lagoon Valley*, *supra*, 154 Cal.App.4th at pages 818 to 823 and *San Francisco Tomorrow, supra*, 229 Cal.App.4th 498.  In *Lagoon Valley*, the petitioner argued a development project was incompatible with elements of the general plan and guiding policies in the transportation element of the general plan, based on anticipated

increases in traffic. Even though the general plan's guiding policies identified a minimum level of service for all intersections, a different policy acknowledged that service could be lower in certain situations. The court noted that the petitioner's "rigid reading of the General Plan would essentially rule out development in the area—a result that is certainly at odds with the policies expressed in the General and Policy Plans." (*Lagoon Valley*, *supra*, 154 Cal.App.4th at p. 821.) In *San Francisco Tomorrow*, the reviewing court also rejected an argument that a long-term redevelopment project was inconsistent with the general plan, where an initiative had identified eight "priority policies" for the general plan, but the court concluded that the plain language of the priority policies was "neither 'mandatory' nor 'clear.'" (*San Francisco Tomorrow, supra*, 229 Cal.App.4th at pp. 519–520.) The court noted that "the policies themselves contain no objective standards, but only subjective standards that neither prohibit any particular development or type of development, nor command any particular outcome." (*Id*. at p. 520.)

Here, because the General Plan—whether we consider the Framework Element or the West Los Angeles Community Plan—does not impose a fundamental, specific or mandatory duty, the question of plan consistency is closer to *San Francisco Tomorrow* and *Lagoon Valley* than *FUTURE or Endangered Habits*, and so we find the City's actions were not an abuse of discretion.

### c. *Compatibility/balancing other policies*

The boundaries of the Expo Plan area bring together areas that "have a unique physical identity in that they comprise

39

approximately 250 acres and are within a transit-oriented area that, pursuant to the General Plan, should be planned for a higher density, transit oriented mixed-use development that reduces vehicle trips; provides greater housing and jobs; and brings additional services and amenities to the surrounding residential area."

The City Council ultimately adopted consistency findings contained in the November 9, 2017 Staff Report and findings in the FEIR concluding that the Expo Plan Project met multiple objectives of the general and applicable community plans, including the West Los Angeles Community Plan.

Because we defer to the City acting in its legislative capacity in balancing multiple policies, goals, and objectives, we find there was substantial evidence to support the City's determination that the Zoning Ordinances were compatible with the objectives of the General Plan.

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to the City of Los Angeles.


MOOR, J.

We concur:


RUBIN, P. J.


KIM, J.

Filed 3/7/24

# CERTIFIED FOR PARTIAL PUBLICATION*
## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION FIVE

| | |
|---|---|
| FIX THE CITY, INC., | B318346 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 18STCP02720) |
| v. | |
| CITY OF LOS ANGELES, | **ORDER MODIFYING OPINION AND CERTIFYING FOR PARTIAL PUBLICATION** |
| Defendant and Respondent. | **NO CHANGE IN JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on February 8, 2024, and modified February 27, 2024, is modified as follows:

1. On page 3, at the beginning of the second full paragraph, the phrase "On the question of timeliness," is replaced with the following sentence:

> In the published portion of this opinion, we consider the timeliness of Fix's challenge to the specific plan.

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of now part B of the Discussion.

2. On page 3, the second full paragraph, the phrase "On the question of plan consistency," is replaced with the following sentence:

> In the unpublished portion of this opinion, we consider the question of plan consistency.

3. On page 8, the first subheading is revised to read as follows:

> A. Fix's Challenge to the Expo Plan is Untimely.

4. On page 25, the first subheading is revised and a footnote is added, as follows:

> B. The City's Finding of General Plan Consistency Was Not an Abuse of Discretion.[*]

5. On page 25, before the second full paragraph that begins "In its second amended petition . . ." insert the following:

> Begin unpublished portion

6. On page 40, after the final paragraph, insert the following:

> End unpublished portion

There is no change in the judgment.

---

[*] See footnote, *ante*, page 1.

The opinion in the above-entitled matter filed on February 8, 2024, and modified on February 27, 2024, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be partially published in the Official Reports and it is so ordered.

_____

RUBIN, J.**                    MOOR, Acting P. J.                    KIM, J.

---

**Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

3